OPINION OF THE COURT
FUENTES, Circuit Judge:
Betting on sports is an activity that has unarguably increased in popularity over the last several decades. Seeking to address instances of illegal sports wagering within its borders and to improve its economy, the State of New Jersey has sought to license gambling on certain professional and amateur sporting events. A conglomerate of sports leagues, displeased at the prospect of State-licensed gambling on their athletic contests, has sued to halt these efforts. They contend, alongside the United States as intervening plaintiff, that New Jersey’s proposed law violates a federal law that prohibits most states from licensing sports gambling, the Professional and Amateur Sports Protection Act of 1992 (PASPA), 28 U.S.C. § 3701 et seq.
In defense of its own sports wagering law, New Jersey counters that the leagues lack standing to bring this case because they suffer no injury from the State’s legalization of wagering on the outcomes of their games. In addition, alongside certain intervening defendants, New Jersey argues that PASPA is beyond Congress’ Commerce Clause powers to enact and that it violates two important principles that underlie our system of dual state and federal sovereignty: one known as the “anti-commandeering” doctrine, on the ground that PASPA impermissibly prohibits the states from enacting legislation to license sports gambling; the other known as the “equal sovereignty” principle, in that PASPA permits Nevada to license widespread sports gambling while banning other states from doing so. The District Court disagreed with each of these contentions, granted summary judgment to the *215 leagues, and enjoined New Jersey from licensing sports betting.
On appeal, we conclude that the leagues have Article III standing to enforce PAS-PA and that PASPA is constitutional. As will be made clear, accepting New Jersey’s arguments on the merits would require us to take several extraordinary steps, including: invalidating for the first time in our Circuit’s jurisprudence a law under the anti-commandeering principle, a move even the United States Supreme Court has only twice made; expanding that principle to suspend commonplace operations of the Supremacy Clause over state activity contrary to federal laws; and making it harder for Congress to enact laws pursuant to the Commerce Clause if such laws affect some states differently than others.
We are cognizant that certain questions related to this case — whether gambling on sporting events is harmful to the games’ integrity and whether states should be permitted to license and profit from the activity — engender strong views. But we are not asked to judge the wisdom of PASPA or of New Jersey’s law, or of the desirability of the activities they seek to regulate. We speak only to the legality of these measures as a matter of constitutional law. Although this “case is made difficult by [Appellants’] strong arguments” in support of New Jersey’s law as a policy matter, see Gonzales v. Raich, 545 U.S. 1, 9, 125 S.Ct. 2195, 162 L.Ed.2d 1 (2005), our duty is to “say what the law is,” Marbury v. Madison, 5 U.S. 137, 1 Cranch 137, 177, 2 L.Ed. 60 (1803). “If two laws conflict with each other, the courts must decide on the operation of each.” Id. New Jersey’s sports wagering law conflicts with PASPA and, under our Constitution, must yield. We will affirm the District Court’s judgment.
I. LEGAL FRAMEWORK
Wagering on sporting events is an activity almost as inscribed in our society as participating in or watching the sports themselves. New Jersey tells us that sports betting in the United States — most of it illegal — is a $500 billion dollar per year industry. And scandals involving the rigging of sporting contests in the interest of winning a wager are as old as the games themselves: the infamous Black Sox scandal of the 1919 World Series, or Major League Baseball’s (“MLB”) lifetime ban on all-time hits leader Pete Rose for allegedly wagering on games he played in come to mind. And the recent prosecution of Tim Donaghy, a National Basketball Association (“NBA”) referee who bet on games that he officiated, reminds us of problems that may stem from gambling.
However, despite its pervasiveness, few states have ever licensed gambling on sporting events. Nevada alone began permitting widespread betting on sporting events in 1949 and just three other states — Delaware, Oregon, and Montana— have on occasion permitted limited types of lotteries tied to the outcome of sporting events, but never single-game betting. Sports wagering in all forms, particularly State-licensed wagering, is and has been illegal elsewhere. See, e.g., 18 Pa. Cons. Stat. Ann. § 5513; Del.Code Ann. tit. 11, § 1401, et seq. Congress took up and eventually enacted PASPA in 1992 in response to increased efforts by states to begin licensing the practice.
A. The Professional and Amateur Sports Protection Act of 1992
PASPA’s key provision applies for the most part identically to “States” and “persons,” providing that neither may
sponsor, operate, advertise, or promote ... a lottery, sweepstakes, or other betting, gambling, or wagering scheme *216 based directly or indirectly (through the use of geographical references or otherwise), on one or more competitive games in which amateur or professional athletes participate, or are intended to participate, or on one or more performances of such athletes in such games.
28 U.S.C. § 3702. The prohibition on private persons is limited to any such activity conducted “pursuant to the law or compact of a governmental entity,” id. § 3702(2), while the states are subject to an additional restriction: they may not “license! ] or authorize by law or compact” any such gambling activities, id. §§ 3702(1), 3701.
PASPA contains three relevant exceptions — a “grandfathering” clause that releases Nevada from PASPA’s grip, see id. § 3704(a)(2), a clause that permitted New Jersey to license sports wagering in Atlantic City had it chosen to do so within one year of PASPA’s enactment, see id. § 3704(a)(3), and a grandfathering provision permitting states like Delaware and Oregon to continue the limited “sports lotteries” that they had previously conducted, see id. § 3704(a)(1). PASPA provides for a private right of action “to enjoin a violation [of the law] ... by the Attorney General or by a ... sports organization ... whose competitive game is alleged to be the basis of such violation.” Id. § 3703.
Only one Court of Appeals has decided a case under PASPA — ours. In Office of the Commissioner of Baseball v. Markell we held that PASPA did not permit Delaware to license single-game betting because the relevant grandfathering provision for Delaware permitted only lotteries consisting of multi-game parlays on NFL teams. 579 F.3d 293, 304 (3d Cir.2009). This is the first case addressing PASPA’s constitutionality.
The Act’s legislative history is sparse but mostly consistent with the foregoing. The Report of the Senate Judiciary Committee makes clear that PASPA’s purpose is to “prohibit sports gambling conducted by, or authorized under the law of, any State or governmental entity” and to “stop the spread of State-sponsored sports gambling.” Sen. Rep. 102-248, at 4, reprinted in 1992 U.S.C.C.A.N. 3553, 3555 (“Senate Report”). The Senate Report specifically notes legislators’ concern with “State-sponsored” and “State-sanctioned” sports gambling. Id. at 3555.
The Senate Report catalogues what the Committee believed were some of the problems arising from sports gambling. Importantly, the Committee noted its concern for “the integrity of, and public confidence in, amateur and professional sports” and its concern that “[widespread legalization of sports gambling would inevitably promote suspicion about controversial plays and lead fans to think ‘the fix was in’ whenever their team failed to beat the point-spread.” Id. at 3556. The Senate Report also stated its concurrence with the then-director of New Jersey’s Division of Gaming Enforcement’s statement that “most law enforcement professionals agree that legalization has a negligible impact on, and in some ways enhances, illegal markets.” Id. at 3558. This is so because “many new gamblers will ... inevitably ... seek to move beyond lotteries to wagers with higher stakes and more serious consequences.” Id.
The Senate Report also explains the Committee’s conclusion that “[s]ports gambling is a national problem” because “[t]he moral erosion it produces cannot be limited geographically” given the thousands who earn a livelihood from professional sports and the millions who are fans of them, and because “[o]nce a State legalizes sports gambling, it will be extremely difficult for other States to resist the lure.” Id. at 3556. Finally, it notes that PASPA exempts Nevada because the Committee did not wish to “threaten [Nevada’s] econ *217 omy,” or of the three other states that had chosen in the past to enact limited forms of sports gambling. Id. at 3559.
B. Sports Gambling in New Jersey Since PASPA Was Enacted
Although New Jersey in its discretion chose not to avail itself of PASPA’s exemption within the one-year window, “[o]ver the course of the next two decades ... the views of the New Jersey voters regarding sports wagering evolved.” Br. of Appellants Sweeney, et al. 4. In 2010, the New Jersey Legislature held public hearings during which it heard testimony that regulated sports gambling would generate much-needed revenues for the State’s casinos and racetracks, and during which legislators expressed a desire to “to stanch the sports-wagering black market flourishing within [New Jersey’s] borders.” Br. of Appellants Christie, et al. 13 (“N.J.Br.”). The Legislature ultimately decided to hold a referendum which would result in an amendment to the State’s Constitution permitting the Legislature to “authorize by law wagering ... on the results of any professional, college, or amateur sport or athletic event.” N.J. Const. Art. IV, § VII, ¶ 2(D), (F). The measure was approved by the voters, and the Legislature later enacted the law that is now asserted to be in violation of PASPA — the “Sports Wagering Law,” which permits State authorities to license sports gambling in casinos and racetracks and casinos to operate “sports pools.” N.J.S.A. 5:12A-1 et seq.; see also N.J.A.C. § 13:69N-1.1 et seq. (regulations implementing the law).
II. PROCEDURAL HISTORY
The NBA, MLB, the National Collegiate Athletic Association (“NCAA”), the National Football League (“NFL”), and the National Hockey League (“NHL”) (collectively, the “Leagues”), sued New Jersey Governor Chris Christie, New Jersey’s Racing Commissioner, and New Jersey’s Director of Gaming Enforcement (the “State” or “New Jersey”), under 28 U.S.C. § 3703, asserting that the Sports Wagering Law is invalidated by PASPA. The New Jersey Senate Majority Leader Stephen Sweeney and House Speaker Sheila Oliver intervened as defendants, alongside the New Jersey Thoroughbred Horsemen’s Association, the owner of the Monmouth Park Racetrack, a business where sports gambling would occur under the Sports Wagering Law (the “NJTHA”) (collectively, “Appellants”).
The State moved to dismiss for lack of standing and the District Court ordered expedited discovery on that question. After the completion of discovery and oral arguments, the District Court concluded that the Leagues have standing. Nat’l Collegiate Athletic Ass’n v. Christie, No. 12-4947, 2012 WL 6698684 (D.N.J. Dec. 21, 2012) (“NCAA I”).
With the constitutionality of PASPA then squarely at issue, the District Court invited the United States to intervene pursuant to 28 U.S.C. § 2403. The District Court ultimately upheld PASPA’s constitutionality, granted summary judgment to the Leagues, and enjoined the Sports Wagering Law from going into effect. Nat’l Collegiate Athletic Ass’n v. Christie, 926 F.Supp.2d 551 (D.N.J.2013) (“NCAA II”). This expedited appeal followed.
III. JURISDICTION: WHETHER THE LEAGUES HAVE STANDING
The District Court had subject-matter jurisdiction pursuant to 28 U.S.C. § 1331, and we have appellate jurisdiction over its final judgment under § 1291. Our jurisdiction, however, is limited by the Constitution’s “cases” and “controversies” requirement. U.S. CONST., art. Ill, § 2. To satisfy this jurisdictional limitation, the party invoking federal court authority *218 must demonstrate that he or she has standing to bring the case.[1]
The Leagues argue they have standing because their own games are the subject of the Sports Wagering Law. They also contend that the law will increase the total amount of gambling on sports available, thereby souring the public’s perception of the Leagues as people suspect that games are affected by individuals with a perhaps competing hidden monetary stake in their outcome. Appellants counter that the Leagues cannot show a concrete, non-speculative injury from any potential increase in legal gambling.
The District Court granted summary judgment to the Leagues, reasoning that Markell supports a holding that the Leagues have standing, and that reputational injury is a legally cognizable harm that may confer standing. It also found sufficient facts in the record to conclude that the Sports Wagering Law will result in an increase in fans’ negative perceptions of the Leagues. We review de novo the legal conclusion that the Leagues have standing, and we review for clear error any factual findings underlying the District Court’s determination. Marion v. TDI Inc., 591 F.3d 137, 146 (3d Cir.2010).
A. The Effect of Markell
Markell, like this case, was a lawsuit by the Leagues to stop a state from licensing single-game betting on the outcome of sporting events. In Markell we “beg[a]n [our analysis], as always, by considering whether we ha[d] jurisdiction to hear [the] appeal,” and later concluded that we did have jurisdiction. 579 F.3d at 297, 300. But, contrary to the Leagues’ suggestion, our analysis was limited to whether we had appellate jurisdiction under 28 U.S.C. § 1292(a). See id. We did not explicitly consider Article III standing, and a “drive-by jurisdictional ruling, in which jurisdiction has been assumed by the parties ... does not create binding precedent.” United States v. Stoerr, 695 F.3d 271, 277 n. 5 (3d Cir.2012) (internal quotation marks and alterations omitted). Therefore, we will not rely on Markell for our standing analysis.
B. Standing Law Generally
Under the familiar three-part test, to establish standing, a plaintiff must show (1) an “injury in fact,” i.e., an actual or imminently threatened injury that is “concrete and particularized” to the plaintiff; (2) causation, i.e., traceability of the injury to the actions of the defendant; and (3) redressability of the injury by a favorable decision by the Court. Summers v. Earth Island Inst., 555 U.S. 488, 493, 129 S.Ct. 1142, 173 L.Ed.2d 1 (2009).
Causation and redressability may be met when “a party ... challenge^] government action that permits or authorizes third-party conduct that would otherwise be illegal in the absence of the Government’s action.” Nat’l Wrestling Coaches Ass’n v. Dep’t of Educ., 366 F.3d 930, 940-41 (D.C.Cir.2004). Here, the Leagues do not purport to enjoin third parties from attempting to fix games. The Leagues have sued to block the Sports Wagering Law, which they assert will result in a taint upon their games, and is a law that by definition constitutes state action to license conduct that would not otherwise occur. Under the reasoning of National Wrestling Coaches, causation *219 and redressability are thus satisfied, and all arguments implicitly aimed at those two prongs are suspect.
Accordingly, we focus on the injury-in-fact requirement, the “contours of [which], while not precisely defined, are very generous.” Bowman v. Wilson, 672 F.2d 1145, 1151 (3d Cir.1982). Indeed, all that Article III requires is an identifiable trifle of injury, United States v. Students Challenging Regulatory Agency Procedures, 412 U.S. 669, 690 n. 14, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973), which may exist if the plaintiff “has ... a personal stake in the outcome of [the] litigation.” The Pitt News v. Fisher, 215 F.3d 354, 360 (3d Cir.2000); see also Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 n. 1, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (noting that to satisfy the injury-in-fact requirement the “injury must affect the plaintiff in a personal and individual way”). To meet this burden, the Leagues must present evidence “in the same way as [for] any other matter on which [they] bear[] the burden of proof.” Lujan, 504 U.S. at 561, 112 S.Ct. 2130.
C. Whether the Sports Wagering Law Causes the Leagues An Injury In Fact
As noted, the Leagues offer two independent bases for standing: that the Sports Wagering Law makes the Leagues’ games the object of state-licensed gambling and that they will suffer reputational harm if such activity expands. We address each in turn.
1. The Leagues are essentially the object of the Sports Wagering Law
Injury in fact may be established when the plaintiff himself is the object of the action at issue. Id. Thus, the Leagues are correct that if the Sports Wagering Law is directed at them, the injury-in-fact requirement is satisfied.
Fairly read, however, the Sports Wagering Law does not directly regulate the Leagues, but instead regulates the activities that may occur at the State’s casinos and racetracks. We thus hesitate to conclude that the Leagues may rely solely on the existence of the Sports Wagering Law to show injury. But that is not to say that we are glib with respect to one of the main purposes of the law: to use the Leagues’ games for profit. Cf. NFL v. Governor of Del., 435 F.Supp. 1372, 1378 (D.Del.1972) (Stapleton, J.) (explaining that Delaware’s sports lottery sought to use the NFL’s “schedules, scores and public popularity” to “mak[e] profits [Delaware] [c]ould not make but for the existence of the NFL”). The Sports Wagering Law is thus, in a sense, as much directed at the Leagues’ events as it is aimed at the casinos. This is not a generalized grievance like those asserted by environmental groups over regulation of wildlife in cases where the Supreme Court has found no standing, such as in Lujan or Summers. The law here aims to license private individuals to cultivate the fruits of the Leagues’ labor.
Appellants counter that the Leagues’ interest in not seeing their games subject to wagering is a non-cognizable “claim for the loss of psychic satisfaction.” N.J. Br. at 31 (citing Steel Co. v. Citizens for a Better Env’t, 523 U.S. 83, 107, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998)). But the holding in Steel Company was that a claim for psychic satisfaction did not present a redressable injury. In that case, a private plaintiff sought a payment into the U.S. Treasury by a private company that had violated federal law, and asserted that such was a redressable injury because the plaintiff would feel “psychic satisfaction” in seeing the payment made. See Steel Co., 523 U.S. at 107, 118 S.Ct. 1003. The case is thus inapposite here, where re-dressability is established because the Leagues assert harm from the very government action they seek to enjoin — the *220 enforcement of the Sports Wagering Law. Moreover, the Leagues do not assert merely psychic, but reputational harm, a very real and very redressable injury.
Appellants also argue that because the Leagues do not have a proprietary interest in the outcomes of their games they may not seek to prevent others from profiting from them. This contention relies on the holding in NFL v. Governor of Delaware, that a Delaware lottery based on the outcome of NFL games did not constitute a misappropriation of the NFL’s property. 435 F.Supp. at 1378-79. But here the Leagues do not complain of an invasion of any proprietary interest, but only refer to the fact of appropriation of their labor to show that the Sports Wagering Law is directed at them.
2. Reputational Harm as Injury In Fact
The Leagues may also meet their burden of establishing injury from a law aimed at their games by proving that the activity sanctioned by that law threatens to cause them reputational harm amongst their fans and the public.
(a) Reputation Harm Is a Legally Cognizable Injury
As a matter of law, reputational harm is a cognizable injury in fact. The Supreme Court so held in Meese v. Keene, where it concluded that a senator who wished to screen films produced by a foreign company had standing to challenge a law requiring the identification of such films as foreign “political propaganda” because the label could harm his reputation with the public and hurt his chances at reelection. 481 U.S. 465, 473-74, 107 S.Ct. 1862, 95 L.Ed.2d 415 (1987). Essentially,' the senator challenged his unwanted association with an undesirable label. Our cases have also recognized that reputational harm is an injury sufficient to confer standing. See, e.g., Bowers v. Nat’l Collegiate Athletic Ass’n, 475 F.3d 524, 542-43 (3d Cir.2007) (concluding that an attorney has standing to challenge a public reprimand because the sanction “affeet[s] [his] reputation”); Doe v. Nat’l Bd. of Med. Exam’rs, 199 F.3d 146, 153 (3d Cir.1999) (holding that a student had standing to challenge a rule requiring that he be identified as disabled because such label could sour the perception of him by “people who can affect his future and his livelihood”).
The Leagues’ claim of injury is identical to that of the plaintiffs in Keene and Doe: they are harmed by their unwanted association with an activity they (and large portions of the public) disapprove of — gambling. Appellants do not dispute this legal premise, but attack the strength of the evidence that the Leagues have proffered to tie the Sports Wagering Law to the reputational harm they assert. These arguments overstate what the Leagues must show to demonstrate reputational harm in this context and, in any case, ignore the strength of the proffered evidence.
(b) The Evidence In the Record Supports the District Court’s Conclusion that Reputational Harm Will Occur
To be sure, at the summary judgment stage, mere allegations of harm are insufficient and specific facts are required. See Lujan, 504 U.S. at 561, 112 S.Ct. 2130. And a plaintiffs claim of fear of reputational harm must always be “based in reality.” Doe, 199 F.3d at 153. But the “nature and extent of facts that must be averred” depends on the nature of the asserted injury. Lujan, 504 U.S. at 561-62, 112 S.Ct. 2130. No one would doubt, for example, that an individual forced to wear a scarlet “A” on her clothing has standing to challenge that action based on reputational harm. Indeed, that was the import of our holding in Doe where, after discounting all of the evidence presented to prove that others’ perception of the plaintiff as disabled could harm him, *221 we concluded that his fear of reputational harm based on an unwanted and stigmatizing label was nevertheless based “in reality.” 199 F.3d at 153. In Keene, by contrast, where the reputational harm from being associated with “foreign political propaganda” was not as intuitive, the Supreme Court held that an undisputed expert opinion that such labels may stigmatize individuals was sufficient to make the required injury-in-fact showing. 481 U.S. at 490, 107 S.Ct. 1862. This suggests a spectrum wherein the sufficiency of the showing that must be made to establish reputational harm depends on the circumstances of each case. Here, the reputa-tional harm that results from increasingly associating the Leagues’ games with gambling is fairly intuitive.
For one, the conclusion that there is a link between legalizing sports gambling and harm to the integrity of the Leagues’ games has been reached by several Congresses that have passed laws addressing gambling and sports, see, e.g., H.R.Rep. No. 88-1053 (1963), 1964 U.S.C.C.A.N. 2250, 2251 (noting that when gambling interests are involved, the “temptation to fix games has become very great,” which in turn harms the honesty of the games); Senate Report at 3555 (noting that PASPA was necessary to “maintain the integrity of our national pastime”). It is, indeed, the specific conclusion reached by the Congress that enacted PASPA, as reflected by the statutory cause of action conferred to the Leagues to enforce the law when their individual games are the target of state-licensed sports wagering. See 28 U.S.C. § 3703. And, presumably, it has also been at least part of the conclusions of the various state legislatures that have blocked the practice throughout our history.
But even if polls like in Keene were always required in reputational harm cases, the Leagues have met that burden. The record is replete with evidence showing that being associated with gambling is stigmatizing, regardless of whether the gambling is legal or illegal. Before the District Court were studies showing that: (1) some fans from each League viewed gambling as a problem area for the Leagues, and some fans expressed their belief that game fixing most threatened the Leagues’ integrity [App. 1605-06]; (2) some fans did not want a professional sports franchise to open in Las Vegas, and some fans would be less likely to spend money on the Leagues if that occurred; and (3) a large number of fans oppose the expansion of legalized sports betting. [2293-98.] This more than suffices to meet the Leagues’ evidentiary burden under Keene and Doe — being associated with gambling is undesirable and harmful to one’s reputation.
Although the Leagues could end their injury in fact proffer there, they also set forth evidence establishing a clear link between the Sports Wagering Law and increased incentives for game-rigging. First, the State’s own expert noted that state-licensing of sports gambling will result in an increase in the total amount of (legal plus illegal) gambling on sports. [App. 325]. Second, a report by the National Gambling Impact Study Commission, prepared at the behest of Congress in 1999, explains that athletes are “often tempted to bet on contests in which they participate, undermining the integrity of sporting contests.” App. 743. Third, there has been at least one instance of match-fixing for NCAA games as a result of wagers placed through legitimate channels, and several as a result of wagers placed in illegal markets for most of the Leagues, and NCAA players' háve affected or have been asked to affect the outcome of games “because of gambling debt.” App. 2245. Thus, more legal gambling leads to more total gambling, which in turn leads to an increased incentive to fix or attempt to fix the Leagues’ matches.
*222 This evidence, together, permits the factual conclusion that being associated with gambling is a stigmatizing label and that, to the extent that the Sports Wagering Law will increase the total amount of gambling as New Jersey’s expert expects, it will increase some fans’ “negative perceptions [of the Leagues] attributed to game fixing and gambling.” NCAA I, 2012 WL 6698684, at *6. We discern no clear error in the District Court’s factual conclusions as derived from these surveys and reports.[2]
3. Appellants’ Counterarguments
Appellants posit that the Leagues cannot establish injury based on any stigma that may attach to wagering, because fans would not think negatively of the Leagues given that it is the State that is licensing the activity against the Leagues’ wishes. But as then-Circuit Judge Scalia explained, an argument that the “public reaction [to] the' alleged harm ... is an irrational one ... is irrelevant to the question of core, constitutional injury-in-fact, which requires no more than defacto causality.” Block v. Meese, 793 F.2d 1303, 1309 (D.C.Cir.1986).
We also find unpersuasive the contention that the increase in incentives to rig the outcome of the Leagues’ games cannot give rise to standing because they depend on unknown actions of third parties. The Leagues do not seek to enjoin individuals from rigging games; they seek to enjoin New Jersey’s law. That a third party’s action may be necessary to complete the complained-of harm does not negate the existence of an injury in fact from the Sports Wagering Law or negate causation and redressability. “It is impossible to maintain ... that there is no standing to sue regarding action of a defendant which harms the plaintiff only through the reaction of third persons. If that principle were true, it is difficult to see how libel actions or suits for inducing breach of contract could be brought in federal court....” Id. Thus, “the traceability requirement [may be] met even where the conduct in question might not have been a proximate cause of the harm.” Edmonson v. Lincoln Nat’l Life Ins. Co., 725 F.3d 406, 418, No. 12-1581, 2013 WL 4007553, *7 (3d Cir. Aug. 7, 2013) (citing The Pitt News, 215 F.3d at 360-61).[3]
Appellants also assert that granting summary judgment to the Leagues was *223 improper because the effect of the studies and opinion polls was disputed by Appellants’ own evidence. In particular, they point to evidence that (1) the Leagues have been economically prospering despite pervasive unregulated sports gambling and state-licensed sports gambling in Nevada; and (2) some individuals would have no interest in the Leagues’ product unless they had a monetary interest in the outcome of games. But these arguments, which sound more like an appeal to commonsense with which, no doubt, many will agree as a policy matter, do not legally deprive the Leagues of standing and are insufficient to raise a genuine issue of material fact.
A plaintiff does not lose standing to challenge an otherwise injurious action simply because he may also derive some benefit from it. Our standing analysis is not an accounting exercise and it does not require a decision on the merits. See, e.g., Denney v. Deutsche Bank AG, 443 F.3d 253, 265 (2d Cir.2006) (noting that “the fact that an injury may be outweighed by other benefits, while often sufficient to defeat a claim for damages, does not negate standing”); see also 13A Charles A. Wright & Arthur Miller, Fed. Prac. & Proc. Juris. 3d § 3531.4, 147 (3d ed.2008). Nor must the Leagues construct counterfactuals analyzing whether they would have done better if PASPA had instituted a complete ban of state-licensed sports gambling or, conversely, worse if PASPA had not existed. And that fans may still buy tickets is not inconsistent with the notion that the Leagues’ esteem suffers in the eyes of fans, which requires the Leagues to take efforts to rehabilitate their image. That alone establishes injury in fact; that the Leagues may have been successful at rehabilitating their images does not deprive them of standing. See, e.g., Keene, 481 U.S. at 475, 107 S.Ct. 1862 (“[T]he need to take ... affirmative steps to avoid the risk of harm to [one’s] reputation constitutes a cognizable injury.”).
As a last resort, Appellants question the Leagues’ commitment to their own argument that state-licensed sports wagering harms them, noting that the Leagues hold events in jurisdictions, such as Canada and England, where gambling on sports is licensed, and that they promote and profit from products that are akin to gambling on sports, such as pay-to-play fantasy leagues. But standing is not defeated by a plaintiffs alleged unclean hands and does not require balancing the equities. That the Leagues may believe that holding events in Canada and England is not injurious to them does not negate that harm may arise from an expansion of sports wagering to the entire country. The same can be said of the Leagues’ promotion of fantasy sports, even if we accept that these activities are akin to head-to-head gambling.[4] And, as even Appellants recognize, it is not the Leagues’ subjective beliefs that control. See Lujan, 504 U.S. at 564, 112 S.Ct. 2130.
* * *
That the Leagues have standing to enforce a prohibition on state-licensed *224 gambling on their athletic contests seems to us a straightforward conclusion, particularly given the proven stigmatizing effect of having sporting contests associated with gambling, a link that is confirmed by commonsense and Congress’ own conclusions.[5]
IV. THE MERITS
We turn now to the merits. The centerpiece of Appellants and amici’s attack on PASPA is that it impermissibly commandeers the states. But at least one party raises the spectre that PASPA is also beyond Congress’ authority under the Commerce Clause of the U.S. Constitution. We thus examine first whether Congress may even regulate the activities that PAS-PA governs. Only after concluding that Congress may do so can we consider whether, in exercising its affirmative powers, Congress exceed a limitation imposed in the Constitution, such as by the anti-commandeering and equal sovereignty principles. See, e.g., Reno v. Condon, 528 U.S. 141, 148-49, 120 S.Ct. 666, 145 L.Ed.2d 587 (2000) (asking, first, whether a law was within Commerce Clause powers and, second, whether the law violated the Tenth Amendment).[6]
A. Whether PASPA is Within Congress’ Commerce Clause Power
1. Modern Commerce Clause Law
Among Congress’ enumerated powers in Article I is the ability to “regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes.” U.S. Const., Art. L, § 8, cl. 3. As is well-known, since NLRB v. Jones & Laughlin Steel Corporation, 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893 (1937), the Commerce Clause has been construed to give Congress “considerable] ... latitude in regulating conduct and transactions.” United States v. Morrison, 529 U.S. 598, 608, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000). For one, Congress may regulate an activity that “substantially affects interstate commerce” if it “arise[s] out of or [is] connected with a commercial transaction.” United States v. Lopez, 514 U.S. 549, 559, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995). By contrast, regulations of non-economic activity are disfavored. Id. at 567, 115 S.Ct. 1624 (striking down a law regulating possession of weapons near schools); see also Morrison, 529 U.S. at 613, 120 S.Ct. 1740 (invalidating a law regulating gender-motivated violence).
2. Gambling and the Leagues’ Contests, Considered Separately or Together, Substantially Affect Interstate Commerce
Guided by these principles, it is self-evident that the activity PASPA targets, state-licensed wagering on sports, may be regulated consistent with the Commerce Clause.
First, both wagering and national sports are economic activities. A wager is simply *225 a contingent contract involving “two or more ... parties, having mutual rights in respect to the money or other thing wagered.” Gibson, 359 P.2d at 86; see also N.J. Stat. Ann. §§ 5:12-21 (defining gambling as engaging in a game “for money, property, checks, or any representative of value”). There can also be no doubt that the operations of the Leagues are economic activities, as they preside essentially over for-profit entertainment. See, e.g., App. 1444 (NFL self-describing its “complex business model that includes a diverse range of revenue streams, which contribute ... to company profitability”).
Second, there can be no serious dispute that the professional and amateur sporting events at the heart of the Leagues’ operations “substantially affect” interstate commerce. The Leagues are associations comprised of thousands of clubs and members, [App. 105], which in turn govern the operations of thousands of sports teams organized across the United States, competing for fans and revenue across the country. “Thousands of Americans earn a ... livelihood in professional sports. Tens of thousands of others participate in college sports.” Senate Report at 3557. Indeed, some of the Leagues hold sporting events abroad, affecting commerce with Foreign Nations.
Third, it immediately follows that placing wagers on sporting events also substantially affects interstate commerce. As New Jersey indicates, Americans gamble up to $500 billion on sports each year. [App. 330-31], And whatever effects gambling on sports may have on the games themselves, those effects will plainly transcend state boundaries and affect a fundamentally national industry. Accordingly, we have deferred to Congressional determinations that “gambling involves the use and has an effect upon interstate commerce.” United States v. Riehl, 460 F.2d 454, 458 (3d Cir.1972).
At bottom, it is clear that PASPA is aimed at an activity that is “quintessentially economic” and that has substantial effects on interstate commerce. See Raich, 545 U.S. at 19-20, 125 S.Ct. 2195. Prohibiting the state licensing of this activity is thus a “rational ... means of regulating commerce” in this area and within Congress’ power under the Commerce Clause. Id. at 26,125 S.Ct. 2195.[7]
3. PASPA Does Not Unconstitutionally Regulate Purely Local Activities
Appellants nevertheless assert that PASPA is unconstitutional because it “reaches unlimited betting activity ... that cannot possibly affect interstate commerce ... [such as] a casual bet on a Giants-Jets football game between family members.” Br. of NJTHA at 34. Parsing words from the statute, they insist PASPA reaches these activities because it prohibits betting in “competitive games” involving “amateur or professional athletes.” 28 U.S.C. § 3702. This argument is merit-less.
For one, PASPA on its face does not reach the intrastate activities that Appellants - contend it does. PASPA prohibits only gambling “schemes” and only those carried out “pursuant to law or compact.” 28 U.S.C. § 3702. The activities described in Appellants’ examples are nor carried out pursuant to state law, or pursuant to “a systemic plan; a connected or orderly arrangement ... [or] [a]n artful plot, or *226 plan.” Black’s Law Dictionary (9th Ed.2009) (defining “scheme”).
Moreover, even entertaining that PASPA somehow reaches these activities, Congressional action over them is permissible if Congress has a “rational basis” for concluding that the activity in the aggregate has a substantial effect on interstate commerce. Raich, 545 U.S. at 22, 125 S.Ct. 2195. The rule of an unbroken line from Wickard v. Filbum, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942), to Raich— respectively upholding limitations on growing wheat at home and personal marijuana consumption — is that when it comes to legislating economic activity, Congress can regulate “even activity that is purely intrastate in character ... where the activity, combined with like conduct by other similarly situated, affects commerce among the States or with foreign nations.” Nat’l League of Cities v. Usery, 426 U.S. 833, 840, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), overruled on other grounds by Garcia v. San Antonio Metro. Transit Auth., 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985) (alterations omitted). And there can be no doubt that Congress had a rational basis to conclude that the intrastate activities at issue substantially affect interstate commerce, given the reach of gambling, sports, and sports wagering into the far corners of the economies of the states, documented above.[8]
Appellants finally seek support in the Supreme Court’s holding that the “individual mandate” of the Affordable Care Act is beyond Congress’ power under the Commerce Clause. See Nat’l Fed’n of Indep. Bus. v. Sebelius, — U.S.-, 132 S.Ct. 2566, 183 L.Ed.2d 450 (2012). But the problem in Sebelius was that the method chosen to regulate (forcing into economic activity individuals previously not in the market for health insurance) was beyond Congress’ power. Here, the method of regulation, banning an activity altogether (in this case the expansion of State-sponsored sports betting), is neither novel nor problematic. See, e.g., Raich, 545 U.S. at 27, 125 S.Ct. 2195.
B. Whether PASPA Impermissibly Commandeers the States
Having concluded that Congress may regulate sports wagering consistent with the Commerce Clause, we turn to PAS-PA’s operation in the case before us.
As noted, PASPA makes it “unlawful for a governmental entity to ... authorize by law or compact” gambling on sports. 28 U.S.C. § 3702. This is classic preemption language that operates, via the Constitution’s Supremacy Clause, see U.S. Const., art. VI, cl. 2, to invalidate state laws that are contrary to the federal statute. See, e.g., Am. Trucking Ass’ns v. City of Los Angeles, — U.S. -, 133 S.Ct. 2096, 2100-01, 2102, 186 L.Ed.2d 177 (2013) explaining that the provision of the Federal Aviation Administration Authorization Act of 1994 (“FAAAA”) that states a “ ‘State ... may not enact or enforce a law ... related to a price, route, or service of any *227 motor carrier ... with respect to the transportation of property’ ... preempts State laws related to a price, route, or service of any motor carrier with respect to the transportation of property” (quoting 49 U.S.C. § 14501(c)(1)). The Sports Wagering Law is precisely what PASPA says the states may not do — a purported authorization by law of sports wagering. It is therefore invalidated by PASPA.[9]
Appellants do not contest any of the foregoing, but argue instead that PASPA’s operation over the Sports Wagering Law violates the “anti-commandeering” principle, which bars Congress from conscripting the states into doing the work of federal officials. The import of this argument, then, is that impermissible anti-commandeering may occur even when all a federal law does is supersede state law via the Supremacy Clause. But the Supreme Court’s anti-commandeering jurisprudence has never entertained this position, let alone accepted it.
1. The Anti-Commandeering Principle
“As every schoolchild learns, our Constitution establishes a system of dual sovereignty between the States and the Federal Government.” Gregory v. Ashcroft, 501 U.S. 452, 457, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991). And it is well-known that all powers not explicitly conferred to the federal government are reserved to the states, a maxim reflected in the text of the Tenth Amendment. U.S. Const., amdt. X; see also United States v. Darby, 312 U.S. 100, 123-24, 61 S.Ct. 451, 85 L.Ed. 609 (1941) (describing this as a “truism” embodied by the Tenth Amendment).
Among the important corollaries that flow from the foregoing is that any law that “commandeers the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program” is beyond the inherent limitations on federal power within our dual system. Hodel v. Va. Surface Mining & Reclamation Ass’n, 452 U.S. 264, 283, 288, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981). Stated differently, Congress “lacks the power directly to compel the States to require or prohibit” acts which Congress itself may require or prohibit. New York v. United States, 505 U.S. 144, 166, 180, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992). The Supreme Court has struck down laws based on these principles on only two occasions, both distinguishable from PASPA.
(a) Permissible regulation in a pre-emptible field: Hodel and FERC
The first modern, relevant incarnation of the anti-commandeering principle appeared in Hodel v. Virginia Surface Mining & Reclamation Ass’n. The law at issue there imposed federal standards for coal mining on certain surfaces and required any state that wished to “assume permanent regulatory authority over ... surface coal mining operations” to “submit a proposed permanent program” to the Federal Government, which, among other things, required the “state legislature [to] enact[ ] laws implementing the environmental protection standards established by the [a]ct.” Hodel, 452 U.S. at 271, 101 S.Ct. 2352. If a particular state did not wish to implement the federal standards, the federal government would step in to do so. Id. at 272, 101 S.Ct. 2352. The Supreme Court upheld the provisions, noting that they neither compelled the states to adopt the federal standards, nor required them “to *228 expend any state funds,” nor coerced them into “participat[ing] in the federal regulatory program in any manner whatsoever.” Id. at 288, 101 S.Ct. 2352. The Court further concluded that Congress could have chosen to completely preempt the field by simply assuming oversight of the regulations itself. Id. It thus held that the Tenth Amendment posed no obstacle to a system by which Congress “chose to allow the States a regulatory role.” Id. at 290, 101 S.Ct. 2352. As the Court later characterized Hodel, the scheme there did not violate the anti-commandeering principle because it “merely made compliance with federal standards a precondition to continued state regulation in an otherwise preempted field.” Printz v. United States, 521 U.S. 898, 926, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997).
The next year, in F.E.R.C. v. Mississippi, the Court upheld a provision requiring state utility regulatory commissions to “consider” whether to enact certain standards for energy efficiency but leaving to the states the ultimate choice of whether to adopt those standards or not. 456 U.S. 742, 746, 769-70, 102 S.Ct. 2126, 72 L.Ed.2d 532 (1982). The Court upheld the law despite its outright commandeering of the state resources needed to consider and study the federal standards, because the law did not definitely require the enactment or implementation of federal standards. Id. at 764, 102 S.Ct. 2126. The Court, noting that Congress had simply regulated where it could have “pre-empted the States entirely” but instead chose to leave some room for the states to maneuver, saw the case as “only one step beyond Hodel.” Id.
(b) Permissible Prohibitions on State Action: Baker and Reno
In a different pair of anti-commandeering cases, the Court upheld affirmative prohibitions on state action that effectively invalidated contrary state laws and even required the states to enact new measures. First, in South Carolina v. Baker, the Supreme Court upheld the validity of laws that “directly regulated the States by prohibiting outright the issuance of bearer bonds.” 485 U.S. 505, 511, 108 S.Ct. 1355, 99 L.Ed.2d 592 (1988). These rules, which also applied to private debt issuers, required the states to “amend a substantial number of statutes in order to [comply].” Id. at 514, 108 S.Ct. 1355. The Court concluded this result did not run afoul the Tenth Amendment because it did not “seek to control or influence the manner in which States regulate private parties” but was simply “an inevitable consequence of regulating a state activity,” id. In subsequent cases, the Court explained that the regulation in Baker was permissible because it simply “subjected a State to the same legislation applicable to private parties.” New York, 505 U.S. at 160, 112 S.Ct. 2408.
Then, in Reno v. Condon, the Court unanimously rejected an anti-commandeering challenge to a law prohibiting states from disseminating personal information obtained by state departments of motor vehicles. South Carolina complained that the act required its employees to learn its provisions and expend resources to comply and, indeed, the federal law effectively blocked the operation of state laws governing the disclosure of that information. 528 U.S. at 150, 120 S.Ct. 666. The Court agreed “that the [act] will require time and effort on the part of state employees” but otherwise rejected the anti-commandeering challenge because, like the law in Baker, the law “d[id] not require the States in their sovereign capacity to regulate their own citizens!,] ... d[id] not require the [State] Legislature^] to enact any laws or regulations, and it d[id] not require state officials to assist in the enforcement of federal statutes regulating private individuals.” Id. at 151, 120 S.Ct. 666. Moreover, the law did not “seek to control[ ] or influence the manner in which States regu *229 late private parties.” Id. (citing Baker, 485 U.S. at 514-15, 108 S.Ct. 1355).
(c) Impermissible Anti-Commandeering: New York and Printz
In contrast to the foregoing, the Court has twice struck down portions of a federal law on anti-commandeering grounds. The first was in New York v. United States, which dealt with a law meant to regulate and encourage the orderly disposal of low-level radioactive waste by the states. 505 U.S. at 149-54, 112 S.Ct. 2408. The “most severe” aspect of the complex system of measures established by the law, referred to as the “take-title” provision, provided that if a particular state had not been able to arrange for the disposal of the radioactive waste by a specified date, then that state would have to take title to the waste at the request of the waste’s generator. Id. at 153-54, 112 S.Ct. 2408 (citing 42 U.S.C. § 2021e(d)(2)(C)). The Court, based on the notion that “Congress may not simply ‘commandeer the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program,’ ” id. at 161, 112 S.Ct. 2408 (quoting Hodel, 452 U.S. at 288, 101 S.Ct. 2352) (alterations omitted), struck down the take-title provision because it did just that: compel the states to either enact a regulatory program, or expend resources in taking title to the waste. Id. at 176, 112 S.Ct. 2408. The Court noted that Congress may enact measures to encourage the states to act and may “hav[e] state law pre-empted by federal regulation” but concluded that the take-title provision “crossed the line distinguishing eneouragement from coercion.” Id. at 167, 175, 112 S.Ct. 2408. The Court also emphasized that the anti-commandeering principle was designed, in part, to stop Congress from blurring the line of accountability between federal and state officials and from skirting responsibility for its choices by foisting them on the states. Id. at 168, 120 S.Ct. 666.
The Court then applied these principles, in Printz, to invalidate the provisions of the Brady Act that required local authorities of certain states to run background checks on persons seeking to' purchase guns. The Court held that Congress “may neither issue directives requiring the States to address particular problems, nor command the States’ officers ... to administer or enforce a federal regulatory program.” 521 U.S. at 935, 117 S.Ct. 2365. The Court was also troubled that these provisions required states to “absorb the financial burden of implementing a federal regulatory program” and “tak[e] the blame for its ... defects.” Id. at 930, 117 S.Ct. 2365.
To date, the schemes at issue in New York and Printz remain the only two that the Supreme Court has struck down under the anti-commandeering doctrine. Our Court has not yet had occasion to consider an anti-commandeering challenge.[10]
2. Whether PASPA Violates the Anti-Commandeering Principle (a) Anti-Commandeering and the Supremacy Clause
Appellants’ arguments that PASPA violates anti-commandeering principles run into an immediate problem: not a single *230 case that we have reviewed involved a federal law that, like PASPA, simply operated to invalidate contrary state laws. It has thus never been the case that applying the Supremacy Clause to invalidate a state law contrary to federal proscriptions is tantamount to direct regulation over the states, to an invasion of their sovereignty, or to commandeering. Most of the foregoing cases involved Congress attempting to directly impose a federal scheme on state officials. If anything, the federal laws in Reno and Baker had the effect of invalidating certain contrary state laws by prohibiting state action, and both survived. Indeed, the Justices in both New York and Prints disclaimed any notion that the anti-commandeering principle somehow suspends the operation of the Supremacy Clause on otherwise valid laws. For example, in Prints the Court explained that our Constitutional structure requires “all state officials ... to enact, enforce, and interpret state law in such a fashion as not to obstruct the operation of federal law, and the attendant reality [is] that all state actions constituting such obstruction, even legislative Acts, are ipso facto invalid.” 521 U.S. at 913, 117 S.Ct. 2365; see also New York, 505 U.S. at 162, 112 S.Ct. 2408 (noting that the Commerce Clause permits Congress to “hav[e] state law preempted by federal [law]”).
In light of the fact that the Supremacy Clause is the Constitution’s answer to the problem that had made life difficult under the Articles of Confederation — the lack of a mechanism to enforce uniform national policies — accepting Appellants’ position that a state’s sovereignty is violated when it is precluded from following a policy different than that set forth by federal law (as New Jersey seeks to do with its Sports Wagering Law), would be revolutionary. See The Federalist No. 44, at 323 (James Madison) (B. Fletcher ed.1996) (explaining that without the Supremacy Clause “all the authorities contained in the proposed Constitution ... would have been annulled, and the new Congress would have been reduced to the same impotent condition with [the Articles of Confederation]”).
And it is not hard to see why invalidating contrary state law does not implicate a state’s sovereignty or otherwise commandeer the states. When Congress passes a law that operates via the Supremacy Clause to invalidate contrary state laws, it is not telling the states what to do, it is barring them from doing something they want to do. Anti-commandeering challenges to statutes worded like PASPA have thus consistently failed. See, e.g., Kelley v. United States, 69 F.3d 1503, 1510 (10th Cir.1995) (upholding constitutionality of intrastate motor carrier statute, noting that it preempted state law and in doing so did not “compel[ ] the states to voluntarily act by enacting or administering a federal regulatory program”); California Dump Truck Owners Ass’n v. Davis, 172 F.Supp.2d 1298, 1304 (E.D.Cal. 2001) (upholding constitutionality of FAAAA provision against an anti-commandeering challenge, noting that, unlike the laws in New York and Prints, the FAAAA provision, insofar as it merely preempts state law, “tell[s] states what not to do ”).[11]
*231 To be sure, the Supremacy Clause elevates only laws that are otherwise within Congress’ power to enact. See, e.g., Neto York, 505 U.S. at 166, 112 S.Ct. 2408 (noting that Congress may not, consistent with the Commerce Clause, “regulate state governments’ regulation of interstate commerce”). But we have held that Congress may prohibit state-licensed gambling consistent with the Commerce Clause. The argument that PASPA is beyond Congress’ authority thus hinges on the notion that the invalidation of a state law pursuant to the Commerce Clause has the same “commandeering” effect as the federal laws struck down in New York and Printz. We turn now to this contention.
(b) PASPA is Unlike the Laws Struck Down in New York and Printz
Appellants’ efforts to analogize PASPA to the provisions struck down in Neiv York and Pñntz are unavailing. Unlike the problematic “take title” provision and the background check requirements, PASPA does not require or coerce the states to lift a finger—they are not required to pass laws, to take title to anything, to conduct background checks, to expend any funds, or to in any way enforce federal law. They are not even required, like the states were in F.E.R.C., to expend resources considering federal regulatory regimes, let alone to adopt them. Simply put, we discern in PASPA no “directives requiring the States to address particular problems” and no “eommand[s] to the States’ officers ... to administer or enforce a federal regulatory program.” Pñntz, 521 U.S. at 935, 117 S.Ct. 2365.
As the District Court correctly reasoned, the fact that PASPA sets forth a prohibition, while the New York/Pñntz regulations required affirmative action(s) on the part of the states, is of significance. Again, it is hard to see how Congress can “commandeer” a state, or how it can be found to regulate how a state regulates, if it does not require it to do anything at all. The distinction is palpable from the Supreme Court’s anti-commandeering cases themselves. State laws requiring affirmative acts may or may not be constitutional, compare F.E.R.C., 456 U.S. at 761-63, 102 S.Ct. 2126 (upholding statute because requirement that states expend resources considering federal standards was not commandeering) with Printz, 521 U.S. at 904-05, 117 S.Ct. 2365 (finding requirement that states perform background checks unconstitutional). On the other hand, statutes prohibiting the states from taking certain actions have never been struck down even if they require the expenditure of some time and effort or the modification or invalidation of contrary state laws, see Baker, 485 U.S. at 515, 108 S.Ct. 1355; Reno, 528 U.S. at 150, 120 S.Ct. 666. As the District Court carefully demonstrated, in all its anti-commandeering cases, the Supreme Court has been concerned with conscripting the states into affirmative action. See NCAA II, 2013 WL 772679, at *17.[12]
*232 Recognizing the importance of the affirmative/negative command distinction, Appellants assert that PASPA does impose an affirmative requirement that the states act, by prohibiting them from repealing anti-sports wagering provisions.[13] We agree with Appellants that the affirmative act requirement, if not properly applied, may permit Congress to “accomplish exactly what the commandeering doctrine prohibits” by stopping the states from “repealing an existing law.” Conant v. Walters, 309 F.3d 629, 646 (9th Cir.2002) (Ko-zinski, J., concurring). But we do not read PASPA to prohibit New Jersey from repealing its ban on sports wagering.
Under PASPA, “[i]t shall- be unlawful for ... a governmental entity to sponsor, operate, advertise, promote, license, or authorize by law or compact ” a sports wagering scheme. 28 U.S.C. § 3702(1) (emphasis added). Nothing in these words requires that the states keep any law in place. All that is prohibited is the issuance of gambling “license[s]” or the affirmative “authorization] by law” of gambling schemes. Appellants contend that to the extent a state may choose to repeal an affirmative prohibition of sports gambling, that is the same as “authorizing” that activity, and therefore PASPA precludes repealing prohibitions on gambling just as it bars affirmatively licensing it. This argument is problematic in numerous respects. Most basically, it ignores that PASPA speaks only of “authorizing by law” a sports gambling scheme. We do not see how having no law in place governing sports wagering is the same as authorizing it by law. Second, the argument ignores that, in reality, the lack of an affirmative prohibition of an activity does not mean it is affirmatively authorized by law. The right to do that which is not prohibited derives not from the authority of the state but from the inherent rights of the people. Indeed, that the Legislature needed to enact the Sports Wagering Law itself belies any contention that the mere repeal of New Jersey’s ban on sports gambling was sufficient to “authorize [it] by law.” The amendment to New Jersey’s Constitution itself did not purport to affirmatively authorize sports wagering but indeed only gave the Legislature the power to “authorize by law” such activities. N.J. Const. Art. IV, § VII, ¶ 2(D), (F). Thus, the New Jersey Legislature itself saw a meaningful distinction between repealing the ban on sports wagering and authorizing it by law, undermining any contention that the amendment alone was sufficient to affirmatively authorize sports wagering — the Sports Wagering Law was required. Cf Hernandez v. Robles, 7 N.Y.3d 338, 821 N.Y.S.2d 770, 855 N.E.2d 1, 5-6 (2006) (rejecting as “untenable” a construction of a domestic relation law, silent on the matter of the legality of same-sex marriages, as permitting such unions). Congress in PASPA itself saw a difference between general sports gambling activity and that which occurs under the auspices of state approval and authorization, and chose to *233 reach private activity only to the extent that it is conducted “pursuant to State law.”
In short, Appellants’ attempt to read into PASPA a requirement that the states must affirmatively keep a ban on sports gambling in their books rests on a false equivalence between repeal and authorization and reads the term “by law” out of the statute, ignoring the fundamental canon that, as between two plausible statutory constructions, we ought to prefer the one that does not raise a series of constitutional problems. See Clark v. Martinez, 543 U.S. 371, 380-81, 125 S.Ct. 716, 160 L.Ed.2d 734 (2005).
To be sure, we take seriously the argument that many affirmative commands can be easily recast as prohibitions. For example, the background check rule of Printz could be recast as a requirement that the states refrain from issuing handgun permits unless background checks are conducted by their officials. The anti-commandeering principle may not be circumvented so easily. But the distinction between PASPA’s blanket ban and Printz’s command, even if the latter is recast as a prohibition, remains. PASPA does not say to states “you may only license sports gambling if you conscript your officials into policing federal regulations” or otherwise impose any condition that the states carry out an affirmative act or implement a federal scheme before they may regulate or issue a license. It simply bars certain acts under any and all circumstances. And if affirmative commands may always be recast as prohibitions, then the prohibitions in myriads of routine federal laws may always be rephrased as affirmative commands. This shows that Appellants’ argument proves too much — the anti-commandeering cases, under that view, imperil a plethora of acts currently termed as prohibitions on the states.
And, to the extent we entertain the notion that PASPA’s straightforward prohibition on action may be recast as presenting two options, these options are also quite unlike the two coercive choices available in New York — pass a law to deal with radioactive waste or expend resources in taking title to it. Neither of PASPA’s two “choices” affirmatively requires the states to enact a law, and both choices leave much room for the states to make their own policy. Thus, under PASPA, on the one hand, a state may repeal its sports wagering ban, a move that will result in the expenditure of no resources or effort by any official. On the other hand, a state may choose to keep a complete ban on sports gambling, but it is left up to each state to decide how much of a law enforcement priority it wants to make of sports gambling, or what the exact contours of the prohibition will be.
We agree that these are not easy choices. And it is perhaps true (although there is no textual or other support for the idea) that Congress may have suspected that most states would choose to keep an actual prohibition on sports gambling on the books, rather than permit that activity to go on unregulated. But the fact that Congress gave the states a hard or tempting choice does not mean that they were given no choice at all, or that the choices are otherwise unconstitutional. See United States v. Martinez-Salazar, 528 U.S. 304, 315, 120 S.Ct. 774, 145 L.Ed.2d 792 (2000) (“A hard choice is not the same as no choice.”); see also F.E.R.C., 456 U.S. at 766, 102 S.Ct. 2126 (upholding a choice between expending state resources to consider federal standards or abandoning field to federal regulation). And however hard the choice is in PASPA, it is nowhere near as coercive as the provisions in New York that punished states unwilling to enact a regulatory scheme and that did pass mus *234 ter. See Neto York, 505 U.S. at 172, 173-74, 112 S.Ct. 2408 (upholding a provision permitting states with waste disposal sites to charge more to non-compliant states and a statute taxing such states to the benefit of compliant states); see also City of Abilene v. EPA, 325 F.3d 657, 662 (5th Cir.2003) (explaining that as long as “the alternative to implementing a federal regulatory program does not offend the Constitution’s guarantees of federalism, the fact that the alternative is difficult, expensive or otherwise unappealing is insufficient to establish a Tenth Amendment violation”). PASPA imposes no punishment or punitive tax. We also disagree with the suggestion that the choices states face under PASPA are as coercive as the Medicaid expansion provision struck down in Sebelius, which threatened states unwilling to participate in a complex and extensive federal regulatory program with the loss of funding amounting to over ten percent of their overall budget. Sebelius, 132 S.Ct. at 2581.
Finally, we note that the attempt to equate a ban on state-sanctioned sports gambling to a plan by Congress to force the states into banning the activity altogether gives far too much credit to Congress’ strong-arming powers. The attendant reality is that in the field of regulating certain activities, such as gambling, prostitution, and drug use, states have always gravitated towards prohibitions, regardless of Congress’ efforts. Indeed, as noted, all but one state prohibited broad state-sponsored gambling at the time PASPA was enacted. Congress, by prohibiting state-licensing schemes, may indeed have made it harder for states to turn their backs on the choices they previously made (although in PASPA it made it less hard for New Jersey), but that choice was already very hard, and very unlikely to be made to begin with (as New Jersey’s history with the regulation of sports gambling also illustrates).
(c) PASPA as Regulating State Conduct — Baker and Reno
Additionally, PASPA is remarkably similar to the prohibitions on state action upheld in Baker and Reno. Baker’s regulations prohibited the states from issuing bearer bonds, which in turn required states to issue new regulations and invalidated old ones; Reno’s anti-disclosure provisions prohibited the states from disseminating certain information, necessitating the expenditure of resources to comply with the federally imposed prohibitions. To the extent PASPA makes it unattractive for states to repeal their anti-sports wagering laws, which in turn requires enforcement by states, the effort PASPA requires is simply that the states enforce the laws they choose to maintain, and is therefore plainly less intrusive than the laws in Baker and Reno. PASPA also has the effect, like the laws in those two cases, of rendering inoperative any contrary state laws.
We are not persuaded by Appellants’ arguments that Baker and Reno are inap-posite. They contend, first, that Reno is different because it involved regulation of the states in the same way as private parties. But that overstates the regulations at issue in Reno, which were directed at state DMVs and only incidentally prohibited private persons from further disseminating data they may obtain from the DMVs. See 528 U.S. at 144, 120 S.Ct. 666. Indeed, the Reno Court did “not address the question whether general applicability is a constitutional requirement for federal regulation of the States.” Id. at 151, 120 S.Ct. 666. And, as mentioned, PASPA does operate on private individuals insofar as it prohibits them from engaging in state-sponsored gambling. But private individuals cannot be prohibited from issuing gambling licenses, because they have never been able to do so. Second, we find no *235 basis to distinguish PASPA from the laws in Reno and Baker on the ground that the latter regulate the states solely as participants in the market. DMVs are uniquely state institutions; states thus obtain information through the DMVs not as participants in the market, but in their unique role as authorizers of commercial activity. PASPA is no different: it regulates the states’ permit-issuing activities by prohibiting the issuance of the license altogether, as in Baker, where the state was essentially prohibited from issuing the bearer bond. Third, we decline to draw a distinction between PASPA and the laws at issue in Reno and Baker on the ground that PAS-PA involves a regulation of the states as states. The Supreme Court’s anti-commandeering cases do not contemplate such distinction.[14]
Despite the fact that PASPA is very similar to the prohibition on state activity upheld unanimously in Reno, Appellants insist that certain statements in that opinion support its view that PASPA is unconstitutional. Appellants insist that under Reno a law is unconstitutional if it requires the states to govern according to Congress’ instructions or if it “influences” the ways in which the states regulate their own citizens. See N.J. Br. at 3, 18, 40, 42, 43, 45-46, 52. But no one contends that PASPA requires the states to enact any laws, and we have held that it also does not require states to maintain existing laws. And one line from Reno, that the law upheld there did not “control or influence the manner in which States regulated private parties,” 528 U.S. at 142, 120 S.Ct. 666, cannot possibly bear the great weight that Appellants would hoist upon it. Most federal regulation inevitably influences the manner in which states regulate private parties. If that were enough to violate the anti-commandeering principle, then Hodel and F.E.R.C. were wrongly decided. Indeed, nowhere in Reno (or Baker, from where that line was quoted, see id. (quoting Baker, 485 U.S. at 514, 108 S.Ct. 1355)), did the Court suggest that the absence of an attempt to influence how states regulate private parties was required to avoid violating the anti-commandeering principle.[15]
(d) The Sports Wagering Law Conflicts With Federal Policy With Respect to Sports Gambling and is Therefore Preempted
Alternatively, to the extent PAS-PA coerces the states into keeping in place their sports-wagering bans, that coercion may be upheld as fitting into the exception drawn in anti-commandeering cases for laws that impose federal standards over conflicting state rules, in areas where Congress may otherwise preempt the field. Under this view, PASPA gives states the choice of either implementing a ban on sports gambling or of accepting complete deregulation of that field as per the federal standard. In Hodel, for example, the choice was implementing certain minimum- *236 safety regulations or living in a world where the federal government enforced them.
PASPA makes clear that the federal policy with respect to sports gambling is that such activity should not occur under the auspices of a state license. As noted, PASPA prohibits individuals from engaging in a sports gambling scheme “pursuant to” state law. 28 U.S.C. § 3702(2). In other words, even if the provision that offends New Jersey, § 3702(1), were excised from PASPA, § 3702(2) would still plainly render the Sports Wagering Law inoperative by prohibiting private parties from engaging in gambling schemes pursuant to that authority. Thus, the federal policy with respect to sports wagering that § 3702(2) evinces is clear: to stop private parties from resorting to state law as a cover for gambling on sports. The Sports Wagering Law, in purporting to permit individuals to skirt § 3702(2), “authorizes [private parties] to engage in conduct that the federal [Act] forbids, [and therefore] it ‘stands as an obstacle to the[ ] accomplishment and execution of the full purposes and objectives of Congress,’ ” and accordingly conflicts with PASPA and is preempted. See Mich. Canners & Freezers Ass’n, Inc. v. Agric. Mktg. & Bargaining Bd., 467 U.S. 461, 469, 104 S.Ct. 2518, 81 L.Ed.2d 399 (1984).[16]
And there are other provisions in federal law, outside of PASPA, aimed at protecting the integrity of sports from the pall of wagering and that further demonstrate the federal policy of disfavoring sports-gambling. Indeed, in enacting PASPA, Congress explicitly noted that the law was “complementary to and ■ consistent with [then] current Federal law” with respect to sports wagering. Senate Report at 3557. Congress has, for example, criminalized attempts to'fix the outcome of a sporting event, 18 U.S.C. § 224, barred the placement of a sports gambling bet through wire communications to or from a place where such bets are illegal, 18 U.S.C. § 1084, and proscribed interstate transportation of means for carrying out sports lotteries, 18 U.S.C. §§ 1301,1307(d).[17]
Appellants contend that Congress has not preempted state law but instead incorporated it to the extent certain prohibitions are tied to whatever is legal under state law. But PASPA itself is not tied to state law. Rather, PASPA prohibits en *237 gaging in schemes pursuant to state law. 28 U.S.C. § 3702(2). To be sure, some of the other cited provisions tie themselves to state law — but the Tenth Amendment does not require that Congress leave less room for the states to govern. Cf. F.E.R.C., 456 U.S. at 764, 102 S.Ct. 2126 (noting that there is no Tenth Amendment problem if Congress “allow[s] the States to enter the field if they promulgate[ ] regulations consistent with federal standards”).
Appellants also attempt to distinguish PASPA from other preemptive schemes. They note that preemptive schemes normally either impose an affirmative federal standard or a rule of non-regulation, and that PASPA does not impose an affirmative federal standard and cannot possibly be construed as a law aimed at permitting unregulated sports gambling because its aim was to stop the spread of sports gambling. But, PASPA’s text and legislative history reflect that its goal is more modest — to ban gambling pursuant to a state scheme — -because Congress was concerned that state-sponsored gambling carried with it a label of legitimacy that would make the activity appealing. Whatever else we may think were Congress’ secret intentions in enacting PASPA, nothing we know of speaks to a desire to ban all sports wagering. Moreover, the argument once again ignores that PASPA does impose a federal standard directly on private individuals, telling them, essentially, thou shall not engage in sports wagering under the auspices of a state-issued license. See 28 U.S.C. § 3702(2).
We hold that PASPA does not violate the anti-commandeering doctrine. Although many of the principles set forth in anti-commandeering cases may abstractly be used to support Appellants’ position, doing so would result in an undue expansion of the anti-commandeering doctrine. If attempting to influence the way states govern private parties, or requiring the expenditure of resources, or giving the states hard choices, were enough to violate anti-commandeering principles, then what of Hodel, F.E.R.C., Baker, and Reno The overriding of contrary state law via the Supremacy Clause may result in influencing or changing state policies, but there is nothing in the anti-commandeering eases to suggest that the principle is meant to apply when a law merely operates via the Supremacy Clause to invalidate contrary state action. Missing here is an affirmative command that the states enact or carry out a federal scheme and PASPA is simply nothing like the only two laws struck down under the anti-commandeering principle. Several important points buttress our conclusion: first, PASPA operates simply as a law of pre-emption, via the Supremacy Clause; second, PASPA thus only stops the states from doing something; and, finally, PASPA’s policy of stopping state-sanctioned sports gambling is confirmed by the independent prohibition on private activity pursuant to any such law. When so understood, it is clear that PASPA does not commandeer the states.
C. Whether PASPA Violates the Equal Sovereignty of the States
Finally, we address Appellants’ contention that PASPA violates the equal sovereignty of the states by singling out Nevada for preferential treatment and allowing only that State to maintain broad state-sponsored sports gambling.
1. Equal Sovereignty Cases — Northwest Austin and Shelby County
The centerpiece of Appellants’ equal sovereignty argument is the Supreme Court’s analysis of the Voting Rights Act of 1965 (“VRA”) in Northwest Austin Municipal Utility District Number One v. *238 Holder, 557 U.S. 193, 129 S.Ct. 2504, 174 L.Ed.2d 140 (2009), and Shelby County, Alabama v. Holder, — U.S. -, 133 S.Ct. 2612, 186 L.Ed.2d 651 (2013). In Northwest Austin, the Supreme Court was asked by a small utility district to rule on the constitutionality of § 5 of the VRA, which required the district to obtain pre-clearance from federal authorities before it could make changes to the manner in which its board was elected. The district had sought an exemption from the pre-clearance requirement, but the district court held that only states are eligible for such “bailouts” under the Act. Nw. Austin, 557 U.S. at 196-97, 129 S.Ct. 2504. On direct appeal, the Supreme Court stated that § 5 raises “federalism concerns” because it “differentiates between the States.” Id. at 203, 129 S.Ct. 2504. The Court also explained that “[distinctions [between the states] can be justified in some cases” such as when Congress enacts “remedies for local evils which have subsequently appeared.” Id. (citing South Carolina v. Katzenbach, 383 U.S. 301, 328-29, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966)). However, the Court did not ultimately decide whether § 5 violated the equal sovereignty principle, invoking instead the canon of constitutional avoidance to construe the VRA’s bailout provision to permit the district to obtain an exemption. Id. at 205, 129 S.Ct. 2504.
In Shelby County, when asked to revisit the constitutionality of § 5, the Court reiterated the “basic principles” of equal sovereignty set forth in Northwest Austin and invalidated § 4(b) of the VRA, which set forth a formula used to determine what jurisdictions are covered by § 5 preclearance. 133 S.Ct. at 2622, 2630-31. Nevertheless, § 5 once more survived despite the expressed equal sovereignty concerns. Id. at 2631.
Appellants ask that we leverage these statements to strike down all of PASPA because it permits Nevada to license sports gambling. We decline to do so. First, the VRA is fundamentally different from PASPA. It represents, as the Supreme Court explained, “an uncommon exercise of congressional power” in an area “the Framers of the Constitution intended the States to keep for themselves ... the power to regulate elections.” Shelby County, 133 S.Ct. at 2623, 2624. The regulation of gambling via the Commerce Clause is thus not of the same nature as the regulation of elections pursuant to the Reconstruction Amendments. Indeed, while the guarantee of uniformity in treatment amongst the states cabins some of Congress’ powers, see, e.g., U.S. Const., art. I., § 8, el. 1 (requiring uniformity in duties and imposts); id. § 9, cl. 6 (requiring uniformity in regulation of state ports), no such guarantee limits the Commerce Clause. This only makes sense: Congress’ exercises of Commerce Clause authority are aimed at matters of national concern and finding national solutions will necessarily affect states differently; accordingly, the Commerce Clause, “[u]nlike other powers of [C]ongress[,] ... does not require geographic uniformity.” Morgan v. Virginia, 328 U.S. 373, 388, 66 S.Ct. 1050, 90 L.Ed. 1317 (1946) (Frankfurter, J., concurring).
Second, New Jersey would have us hold that laws treating states differently can “only” survive if they are meant to “remedy local evils” in a manner that is “sufficiently related to the problem that it targets.” N.J. Br. at 55. This position is overly broad in that it requires the existence of a one-size-fits-all test for equal sovereignty analysis, which, as the foregoing shows, is a perilous proposition in the context of the Commerce Clause. And Northwest Austin’s statement that equal sovereignty may yield when local evils appear was made immediately after the statement that regulatory “[distinctions *239 can be justified in some cases.” 557 U.S. at 203, 129 S.Ct. 2504 (emphasis added). Thus, local evils appear to be but one of the types of cases in which a departure from the equal sovereignty principle is permitted.
Third, there is nothing in Shelby County to indicate that the equal sovereignty principle is meant to apply with the same force outside the context of “sensitive areas of state and local policymaking.” Shelby County, 133 S.Ct. at 2624. We “had best respect what the [Court’s] majority says rather than read between the lines.... If the Justices are pulling our leg, let them say so.” Sherman v. Cmty. Consol. Sch. Dist. 21 of Wheeling Twp., 980 F.2d 437, 448 (7th Cir.1992).
Fourth, even accepting that the equal sovereignty principle applies in the same manner in the context of Commerce Clause legislation, we have no trouble concluding that PASPA passes muster. Appellants’ argument that PASPA’s exemption does not properly remedy local evils because it “targetfed] the States in which legal sports wagering was absent,” N.J. Br. at 56 (emphasis omitted), again distorts PASPA’s purpose as being to wipe out sports gambling altogether. When the true purpose is considered — to stop the spread of state-sanctioned sports gambling — it is clear that regulating states in which sports-wagering already existed would have been irrational. Targeting only states where the practice did not exist is thus more than sufficiently related to the problem, it is precisely tailored to address the problem. If anything, Appellants’ quarrel seems to be with PASPA’s actual goal rather than with the manner in which it operates.
Finally, Appellants ignore another feature that distinguishes PASPA from the VRA — that far from singling out a handful of states for disfavored treatment, PASPA treats more favorably a single state. Indeed, it is noteworthy that Appellants do not ask us to invalidate § 3704(a)(2), the Nevada grandfathering provision that supposedly creates the equal sovereignty problem. Instead, we are asked to strike down § 3702, PASPA’s general prohibition on state-licensed sports gambling. Appellants do not explain why, if PASPA’s preferential treatment of Nevada violates the equal-sovereignty doctrine, the solution is not to strike down only that exemption. The remedy New Jersey seeks — a complete invalidation of PASPA — does far more violence to the statute, and would be a particularly odd result given the law’s purpose of curtailing state-licensed gambling on sports. That New Jersey seeks Nevada’s preferential treatment, and not a complete ban on the preferences, undermines Appellants’ invocation of the equal sovereignty doctrine.
2. Grandfathering Clause
Cases Appellants also argue that PAS-PA’s exemption for Nevada is invalid under the Supreme Court’s analysis in City of New Orleans v. Dukes, 427 U.S. 297, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976), and Minnesota v. Clover Leaf Creamery, 449 U.S. 456, 101 S.Ct. 715, 66 L.Ed.2d 659 (1981), of grandfathering provisions in economic legislation. But in both cases the Supreme Court upheld the provisions: in Dukes, an ordinance that banned push cart vendors from New Orleans’ historic district, but grandfathered those of a certain vintage, 427 U.S. at 305, 96 S.Ct. 2513; in Clover Leaf, a statute banning the sale of milk in non-recyclable containers but grandfathering non-recyclable paper containers, 449 U.S. at 469, 101 S.Ct. 715.
Two cases upholding economic ordinances aimed at private parties have little to say about state sovereignty. While Appellants contend that Dukes and Clover Leaf Creamery support their position be *240 cause they upheld temporary grandfathering clauses, there was no indication in either case that the clauses upheld were indeed temporary, that the legislatures were obligated to rescind them in the future, or even that the supposedly temporal quality of the laws was the basis of the Court’s holdings, other than a statement in passing in Dukes that the legislature had chosen to “initially” target only a particular class of products. 427 U.S. at 305, 96 S.Ct. 2513.[18]
Appellants note that there is no case where a court has “permitted a grandfathering rationale to serve as a justification for violating the fundamental principle of equal sovereignty.” N. J. Br. at 59. But it is not hard to see why this is the ease: only two Supreme Court cases in modern times have applied the equal sovereignty principle.[19]
V. CONCLUSION
If baseball is a game of inches, constitutional adjudication may be described as a matter of degrees. The questions we have addressed are in many ways sui generis. Neither the standing nor the merits issues we have tackled permit an easy solution by resorting to a controlling case that provides a definitive “Eureka!” moment. Our role thus is to distill an answer from precedent and the principles embodied therein. But we are confident that our adjudication of this dispute and our resolution of its merits leave us well within the strict bounds set forth by the Constitution and preserves intact the state-federal balance of power.
Having examined the difficult legal issues raised by the parties, we hold that nothing in PASPA violates the U.S. Constitution. The law neither exceeds Congress’ enumerated powers nor violates any principle of federalism implicit in the Tenth Amendment or anywhere else in our Constitutional structure. The heart of Appellants’ constitutional attack on PASPA is their reliance on two doctrines that — while of undeniable importance — have each only been used to strike down notably intrusive and, indeed, extraordinary federal laws. Extending these principles as Appellants propose would result in significant changes to the day-to-day operation of the Supremacy Clause in our constitutional structure. Moreover, we see much daylight between the exceedingly intrusive statutes invalidated in the anti-commandeering cases and PASPA’s much more straightforward mechanism of stopping the states from lending their imprimatur to gambling on sports.
New Jersey and any other state that may wish to legalize gambling on sports within their borders are not left without redress. Just as PASPA once gave New *241 Jersey preferential treatment in the context of gambling on sports, Congress may again choose to do so or, more broadly, may choose to undo PASPA altogether. It is not our place to usurp Congress’ role simply because PASPA may have become an unpopular law. The forty-nine states that do not enjoy PASPA’s solicitude may easily invoke Congress’ authority should they so desire.
The District Court’s judgment is AFFIRMED.

. The United States notes there may be questions as to whether the District Court’s injunction is an appealable final order because it does not specify what steps the State must undertake to comply with the injunction, but we conclude that the injunction is an appeal-able final order because the merits opinion describes what the State must do—refrain from licensing sports gambling. See NCAA II, 926 F.Supp.2d at 579.

. More fundamentally, it is clear to us that gambling and match-fixing scandals tend to tarnish the Leagues' reputations. Media reports to that effect abound. To take but one, after the Tim Donaghy NBA gambling and game-fixing scandal, commentators noted that "the integrity of the [NBA’s] games just took a major hit.” J.A. Adande, Ref investigation only adds to bad perception of NBA, ESPN.com, July 19, 2007, http://sports.espn. go.com/nba/columns/story?id=2943704. It is simply untenable to hold that the Leagues have not identified a trifle of reputational harm from an increase in even legal of licensed sports gambling.

. Appellants rely almost exclusively on Simon v. Eastern Kentucky Welfare Rights Organization, 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976), for the proposition that the repu-tational injury at issue here is insufficient because it "result[s] 'from the independent action of some third party not before the court.’ ” N.J. Br. at 23 (quoting Simon, 426 U.S. at 41-42, 96 S.Ct. 1917). This argument greatly overstates the effect of Simon. There, a group of indigent individuals brought suit against the IRS, asserting that the IRS's tax designation of certain hospitals harmed them by making it less likely that the hospitals would provide them free services. The Supreme Court concluded that the plaintiffs lacked standing because it was “purely speculative whether the denials of services ... fairly can be traced to [the IRS' actions] or instead result from decisions made by the hospitals without regard to the tax implications.” Simon, 426 U.S. at 42-43, 96 S.Ct. 1917. But here we are dealing with a law that licenses conduct that casinos could not *223 otherwise undertake under the State’s auspices, and thus the third party’s actions are not truly independent of the State's conduct. See Nat'l Wrestling Coaches Ass’n, 366 F.3d at 941.

. We note, however, the legal difference between paying fees to participate in fantasy leagues and single-game wagering as contemplated by the Sports Wagering Law. See Humphrey v. Viacom, Inc., No. 06-2768(DMC), 2007 WL 1797648, at *9 (D.N.J. June 20, 2007) (holding that fantasy leagues that require an entry fee are not subject to anti-betting and wagering laws); Las Vegas Hacienda, Inc. v. Gibson, 77 Nev. 25, 359 P.2d 85, 86-87 (1961) (holding that a "hole-in-one” contest that required an entry fee was a prize contest, not a wager).

. We also note that, although the United States’ intervention does not always give us jurisdiction, a court may treat intervention as a separate suit over which it has jurisdiction, if the intervenor has standing, particularly when the intervenor enters the proceedings at an early stage. See, e.g., Disability Advocates, Inc. v. New York Coal. For Assisted Living, Inc., 675 F.3d 149, 161 (2d Cir.2012); Fuller v. Volk, 351 F.2d 323, 328 (3d Cir.1965). Thus, the United States' intervention independently supports our jurisdiction.

. We review de novo a determination regarding PASPA's constitutionality, Gov't of V.I. v. Steven, 134 F.3d 526, 527 (3d Cir.1998), and begin with the “time-honored presumption that [an act of Congress] is a constitutional exercise of legislative power.” Reno, 528 U.S. at 148, 120 S.Ct. 666 (internal quotation marks omitted) (quoting Close v. Glenwood Cemetery, 107 U.S. 446, 475, 2 S.Ct. 267, 27 L.Ed. 408 (1883)).

. But see Federal Baseball Club of Balt. v. Nat'l League of Prof'l Baseball Clubs, 259 U.S. 200, 208-09, 42 S.Ct. 465, 66 L.Ed. 898 (1922) (describing MLB’s business as “giving exhibitions of base ball, which are purely state affairs,” and concluding that baseball is not in interstate commerce for purposes of the Sherman Antitrust Act).

. Moreover, if PASPA reaching activities that are purely intrastate in nature were constitutionally problematic, we would construe its language as not reaching such acts. After all, "[t]he cardinal principle of statutory construction is to save and not to destroy.... [A]s between two possible interpretations of a statute, by one of which it would be unconstitutional and by the other valid, our plain duty is to adopt that which will save the act.” Jones & Laughlin Steel, 301 U.S. at 30, 57 S.Ct. 615. Appellants’ reading of PASPA to reach casual bets between friends steamrolls that principle. At the very worst, we would leave for another day the question of whether PASPA may constitutionally be applied to such a local wager. Appellants today have not shown that "no set of circumstances exists under which the [challenged] Act would be valid.” CMR D.N. Corp. v. City of Phila., 703 F.3d 612, 623 (3d Cir.2013) (alteration in original).

. This straightforward operation of the Supremacy Clause, which operates on states laws that are foreclosed by a stand-alone federal provision, is not to be confused with field preemption of sports wagering, a topic we discuss at part IV.B.2.d below.

. Three other cases complete the constellation of the Supreme Court’s modern anti-commandeering jurisprudence but deal with the applicability of federal labor laws to certain State employees. See Nat’l League of Cities, 426 U.S. at 883, 96 S.Ct. 2465; Garcia, 469 U.S. at 528, 105 S.Ct. 1005; Gregory, 501 U.S. at 452, 111 S.Ct. 2395. These cases are of marginal relevance, so we do not elaborate on them at length. See also Marked, 579 F.3d at 303 (rejecting an argument that PASPA violates the sovereignty principles set forth in Gregory).

. As the Leagues note, numerous federal laws are framed to prohibit States from enacting or enforcing laws contrary to federal standards, and these regulations all enjoy different preemptive qualities. See, e.g., Farina v. Nokia, 625 F.3d 97, 130 (3d Cir.2010) (noting that statute which provides that "no State ... shall have any authority to regulate the entry of or the rates charged by any commercial mobile service” is an express preemption provision); MacDonald v. Monsanto, 27 F.3d 1021, 1024 (5th Cir.1994) (noting that law stating that a “State shall not impose or continue in effect any requirement for labeling or packing” pesticides is a preemption provision). The operation of these and other provisions is called into question by Appellants’ view that the everyday operation of the Su *231 premacy Clause raises anti-commandeering concerns.

. The circuits that have considered anti-commandeering challenges, although addressing laws that are fundamentally different from PASPA, have similarly found this distinction significant. See, e.g., Connecticut v. Physicians Health Servs. of Conn., 287 F.3d 110, 122 (2d Cir.2002) (holding that a provision “limiting] states’ power to sue as parens patriae ... does not commandeer any branch of state government because it imposes no affirmative duty of any kind on them”); Fraternal Order of Police v. United States, 173 F.3d 898, 906 (D.C.Cir.1999) (rejecting a commandeering challenge to a statute that did "not force state officials to do anything affirmative to implement” the statutory provision).

. Appellants also rely on Coyle v. Smith, where the Supreme Court struck down a law requiring Oklahoma to not change the location of its capital within seven years of its admission into the Union, 221 U.S. 559, 567, 31 S.Ct. 688, 55 L.Ed. 853 (1911), to lessen the significance of the "affirmative act” requirement we distill from the anti-commandeering cases. N.J. Br. 42, 44. But, despite the Supreme Court's citation to Coyle in Mew York, see 505 U.S. at 162, 112 S.Ct. 2408, Coyle did not turn on impermissible commandeering. Instead, the Court struck down the statute as being traceable to no power granted by Congress in the Constitution, pertaining "purely to the internal policies] of the state,” and in violation of the principle that all states are admitted on equal footing into the Union. Coyle, 221 U.S. at 565, 579, 31 S.Ct. 688. PASPA does not raise any of these concerns, and neither do the modern anti-commandeering cases.

. And, arguably, the Supreme Court’s Tenth Amendment jurisprudence cautions against drawing lines between activities that are “traditional” to state government and those that are not. See Garcia, 469 U.S. at 546, 105 S.Ct. 1005 (calling such distinctions "unworkable”).

. The parties spar over how the accountability concerns of anti-commandeering cases weigh here. But New York and Printz make clear that they are not implicated when Congress does not enlist the States in the implementation of a federal regulatory program. To strike down any law that may cause confusion as to whether a prohibition comes from the federal government or from a State’s choice, before considering whether that law actually commandeers the States, is to put the cart before the horse. Indeed, the Supreme Court in Reno rejected the notion that simply raising the specter of accountability problems is enough to find an anti-commandeering violation. See 528 U.S. at 150-51, 120 S.Ct. 666.

. New Jersey asks that we ignore this argument because it was not raised by the United States below. But it is axiomatic that we may affirm on any ground apparent on the record, particularly when considering de novo the constitutionally of a Congressional enactment. The United States may decide not to advance particular arguments, but we may not, consistent with our duty to "save and not to destroy,” Jones & Laughlin Steel, 301 U.S. at 30, 57 S.Ct. 615, use that choice to declare unconstitutional an act of Congress. The same may be said of arguments that the United States and the Leagues' reading of PASPA has changed throughout the litigation and should therefore be discounted, see, e.g., Oral Arg. Tr. 71:14-19 (June 26, 2013).

. Appellants point to a statement in the Senate Report wherein the Committee notes that, according to the Congressional Budget Office, there would be "no cost to the federal government ... from enactment of this bill,” Senate Report at 3561, as proof that PASPA seeks to foist upon the states the responsibility for banning sports wagering. But this statement is taken out of context. The import of it was that PASPA would require no "direct spending or receipts” of funds, id, but the Senate Report itself makes clear that the Justice Department would use already-earmarked funds to permit it to "enforce the law without utilizing criminal prosecutions of State officials,” id. at 3557. For a report issued well before the opinions in New York and Printz delineated the contours of modern anti-commandeering jurisprudence, the Senate Report is remarkably clear in that it seeks to increase the federal government's role in policing sports wagering, not pass that obligation along to the states.

. Nor does our decision in Delaware River Basin Commission v. Bucks County Water & Sewer Authority support the notion that permanent grandfathering clauses are invalid, given that in that case we simply remanded for development of a record as to why the law at issue contained a grandfathering provision. 641 F.2d 1087, 1096-98 (3d Cir.1981). PAS-PA’s legislative history is clear as to the purpose behind its own exemptions, and thus survives Delaware River Basin.

. Appellants also rely on the so-called "equal footing” principle, the notion that Congress may not burden a new state's entry into the Union by disfavoring them over other states in support of their attack on Nevada's exemption. See, e.g., Escanaba & Lake Mich. Transp. v. Chicago, 107 U.S. 678, 689, 2 S.Ct. 185, 27 L.Ed. 442 (1883) (explaining that whatever restriction may have been imposed over Illinois' ability to regulate the operation of bridges over the Chicago River, such restrictions disappeared once Illinois was admitted into the Union as a state); Coyle, 221 U.S. at 567, 31 S.Ct. 688 (holding that Congress may not require Oklahoma to not change its capital as a condition of admission into the Union). But PASPA does not speak to conditions of admission into the Union.