OPINION
RENDELL, Circuit Judge:
The issue presented in this appeal is whether SB 2460, which the New Jersey Legislature enacted in 2014 (the “2014 Law”) to partially repeal certain prohibitions on sports gambling, violates federal law. 2014 N.J. Sess. Law Serv. Ch. 62, codified at N.J. Stat. Ann. §§ 5:12A-7 to - 9. The District Court held that the 2014 Law violates the Professional and Amateur Sports Protection Act (“PASPA”), 28 U.S.C. §§ 3701-3704. We will affirm. PASPA, by its terms, prohibits states from authorizing by law sports gambling, and the 2014 Law does exactly that.
I. Background
Congress passed PASPA in 1992 to prohibit state-sanctioned sports gambling. PASPA provides:
It shall be unlawful for—
(1) a governmental entity to sponsor, operate, advertise, promote, license, or authorize by law or compact, or
(2) a person to sponsor, operate, advertise, or promote, pursuant to the law or compact of a governmental entity, a lottery, sweepstakes, or other betting, gambling, or wagering scheme based ... on one or more competitive games in which amateur or professional athletes participate, or are intended to participate, or on one or more performances of such athletes in such games.
28 U.S.C. § 3702 (emphasis added). PASPA defines “governmental entity” to include states and their political subdivisions. 28 U.S.C. § 3701(2). PASPA includes a remedial provision that permits any sports league whose games are or will be the subject of sports gambling to bring an action to enjoin the gambling. 28 U.S.C. § 3703.
Congress included in PASPA exceptions for state-sponsored sports wagering in Nevada and sports lotteries in Oregon and Delaware, and also an exception for New Jersey but only if New Jersey were to enact a sports gambling scheme within one year of PASPA’s enactment. 28 U.S.C. § 3704(a). New Jersey did not do so and, thus, the PASPA exception expired. Notably, sports gambling was prohibited in New Jersey for many years by statute and by the New Jersey Constitution. See, e.g., N.J. Const. Art. IV § VII ¶ 2; N.J. Stat. Ann. § 2C:37-2; N.J. Stat. Ann. § 2A:40-1. In 2010, however, the New Jersey Leg *262 islature held public hearings on the advisability of allowing sports gambling. These hearings included testimony that sports gambling would generate revenues for New Jersey’s struggling casinos and racetracks. In 2011, the Legislature held a referendum asking New Jersey voters whether sports gambling should be permitted, and sixty-four percent voted in favor of amending the New Jersey Constitution to permit sports gambling. The constitutional amendment provided:
It shall also be lawful for the Legislature to authorize by law wagering at casinos or gambling houses in Atlantic City on the results of any professional, college, or amateur sport or athletic event, except that wagering shall not be permitted on a college sport or athletic event that takes place in New Jersey or on a sport or athletic event in which any New Jersey college team participates regardless of where the event takes place....
N.J. Const. Art. IV, § VII, 12(D). The amendment thus permitted the New Jersey Legislature to “authorize by law” sports wagering at “casinos or gambling houses in Atlantic City,” except that wagering was not permitted on New Jersey college teams or on any collegiate event occurring in New Jersey. An additional section of the amendment permitted the Legislature to “authorize by law” sports wagering at “current or former running and harness horse racetracks,” subject to the same restrictions regarding New Jersey college teams and collegiate events occurring in New Jersey. N.J. Const. Art. IV, § VII, 12(F).
After voters approved the sports-wagering constitutional amendment, the New Jersey Legislature enacted the Sports Wagering Act in 2012 (“2012 Law”), which provided for regulated sports wagering at New Jersey’s casinos and racetracks. N.J. Stat. Ann. §§ 5:12A-1 et seq. (2012). The 2012 Law established a comprehensive regulatory scheme, requiring licenses for operators and individual employees, extensive documentation, minimum cash reserves, and Division of Gaming Enforcement access to security and surveillance systems.
Five sports leagues[1] sued to enjoin the 2012 Law as violative of PASPA.[2] The New Jersey Parties did not dispute that the 2012 Law violated PASPA, but urged, instead, that PASPA was unconstitutional under the anti-commandeering doctrine. The District Court held that PASPA was constitutional and enjoined implementation of the 2012 Law. The New Jersey Parties appealed, and we affirmed in National Collegiate Athletic Ass’n v. Governor of *263 New Jersey, 730 F.3d 208 (3d Cir.2013) (Christie I).
Christie I rejected the New Jersey Parties’ argument that PASPA was unconstitutional. In explaining that PASPA does not commandeer the states’ legislative processes, we stated: “[njothing in [PASPA’s] words requires that the states keep any law in place. All that is prohibited is the issuance of gambling ‘license[s]’ or the affirmative ‘authorization] by law’ of gambling schemes.” Id. at 232 (alterations in original). The New Jersey Parties had urged that PASPA commandeered the state because it prohibited the repeal of New Jersey’s prohibitions on sports gambling; they reasoned that repealing a statute barring an activity would be equivalent to authorizing the activity, and “authorizing” was not allowed by PASPA. We rejected that argument, observing that “PASPA speaks only of ‘authorizing by law ’ a sports gambling scheme,” and “[w]e [did] not see how having no law in place governing sports wagering is the same as authorizing it by law.” Id. We further emphasized that “the lack of an affirmative prohibition of an activity does not mean it is affirmatively authorized by law. The right to do that which is not prohibited derives not from the authority of the state but from the inherent rights of the people.” Id. In short, we concluded that the New Jersey Parties’ argument rested on a “false equivalence between repeal and authorization.” Id. at 233.
The New Jersey Parties appealed to the United States Supreme Court, which denied certiorari. Christie I is now the law of the Circuit: PASPA is constitutional and does not violate the anti-commandeering doctrine.
Undeterred, in 2014, the Legislature passed the 2014 Law, SB 2460, which provided in part:
any rules and regulations that may require or authorize any State agency to license, authorize, permit or otherwise take action to allow any person to engage in the placement or acceptance of any wager on any professional, collegiate, or amateur sport contest or athletic event, or that prohibit participation in or operation of a pool that accepts such wagers, are repealed to the extent they apply or may be construed to apply at a casino or gambling house operating in this State in Atlantic City or a running or harness horse racetrack in this State, to the placement and acceptance of wagers on professional, collegiate, or amateur sport contests or athletic events....
N.J. Stat. Ann. § 5:12A-7. The 2014 Law specifically prohibited wagering on New Jersey college teams’ competitions and on any collegiate competition occurring in New Jersey, and it limited sports wagering to “persons 21 years of age or older situated at such loeation[s],” namely casinos and racetracks. Id.
II. Procedural History and Parties’ Arguments
The Leagues filed suit to enjoin the New Jersey Parties from giving effect to the 2014 Law. The District Court held that the 2014 Law violates PASPA, granted summary judgment in favor of the Leagues and issued a permanent injunction against the Governor of New Jersey, the Director of the New Jersey Division of Gaming Enforcement, and the Executive Director of the New Jersey Racing Commission (collectively, the “New Jersey Enjoined Parties”).[3] The District Court *264 interpreted Christie I as holding that PASPA offers two choices to states: maintaining prohibitions on sports gambling or completely repealing them. It reasoned that PASPA preempts the 2014 Law because the 2014 Law is a partial repeal that necessarily results in sports wagering with the State’s imprimatur. The New Jersey Parties appealed.
On appeal, the New Jersey Parties argue that the 2014 Law complies with PAS-PA and is consistent with Christie I because the New Jersey Legislature effected a repealer as Christie I specifically permitted. The NJTHA argues that the District Court erred in granting injunctive relief to the Leagues because the Leagues have unclean hands from supporting sports gambling in other contexts, and that any injunctive relief should be limited to the Leagues’ games and should not include games of entities who are not parties to this action.
The Leagues urge that the 2014 Law violates PASPA because it “authorizes” and “licenses” sports gambling. The United States submitted an amicus brief in support of the Leagues arguing that the 2014 Law impermissibly “licenses” sports wagering by confining the repeal of gambling prohibitions to licensed gambling facilities and thus, in effect, enlarging the terms of existing gaming licenses.
We conclude that the District Court did not err in striking down the 2014 Law.
III. Analysis[4]
A. The 201U Law Violates PASPA
As a preliminary matter, we acknowledge New Jersey’s salutary purpose in attempting to legalize sports gambling to revive its troubled casino and racetrack industries. The New Jersey Assembly Gaming and Tourism Committee chairman stated, in regards to the 2014 Law, that “[w]e want to give the racetracks a shot in the arm. We want to help Atlantic City. We want to do something for the gaming business in the state of New Jersey, which *265 has been under tremendous duress____”
(App. 91.) New Jersey State Senator Ray Lesniak, a sponsor of the law, has likewise stated that “[sjports betting will be a lifeline to the casinos, putting people to work and generating economic activity in a growth industry.” (App. 94.) And New Jersey State Senator Joseph Kyrillos stated that “New Jersey’s continued prohibition on sports betting at our casinos and racetracks is contrary to our interest of supporting employers that provide tens of thousands of jobs and add billions to our state’s economy” and that “[sjports betting will help set New Jersey’s wagering facilities apart from the competition and strengthen Monmouth Park and our struggling casino industry.” (App. 138.) PAS-PA has clearly stymied New Jersey’s attempts to revive its casinos and racetracks and provide jobs for its workforce.
Moreover, PASPA is not without its critics, even aside from its economic impact. It has been criticized for prohibiting an activity, i.e., sports gambling, that its critics view as neither immoral nor dangerous. It has also been criticized for encouraging the spread of illegal sports gambling and for making it easier to fix games, since it precludes the transparency that accompanies legal activities.[5] Simply put, “[wje are cognizant that certain questions related to this case — whether gambling on sporting events is harmful to the games’ integrity and whether states should be permitted to license and profit from the activity — engender strong views.” Christie I, 730 F.3d at 215. While PASPA’s provisions and its reach are controversial and, some might say, unwise, “we are not asked to judge the wisdom of PASPA” and “[ijt is not our place to usurp Congress’ role simply because PASPA may have become an unpopular law.” Id. at 215, 241. We echo Christie I in noting that “New Jersey and any other state that may wish to legalize gambling on sports ... are not left without redress. Just as PASPA once gave New Jersey preferential treatment in the context of gambling on sports, Congress may again choose to do so or ... may choose to undo PASPA altogether.” Id. at 240-41. Unless or until that happens, however, we are duty-bound to interpret the text of the law as Congress wrote it.
We now turn to the primary question before us: whether the 2014 Law violates PASPA. We hold that it does. Under PASPA, it shall be unlawful for “a governmental entity to sponsor, operate, advertise, promote, license, or authorize by law or compact” sports gambling. 28 U.S.C. § 3702(1). We conclude that the 2014 Law violates PASPA because it authorizes by law sports gambling.
First, the 2014 Law authorizes casinos and racetracks to operate sports gambling while other laws prohibit sports gambling by all other entities. Without the 2014 Law, the sports gambling prohibitions would apply to casinos and racetracks. Appellants urge that the 2014 Law does not provide authority for sports gambling because we previously held that “[tjhe right to do that which is not prohibited derives not from the authority of the state but from the inherent rights of the people” and that “[wje do not see how having no law in place governing sports wagering is the same as authorizing it by law.” Christie I, 730 F.3d at 232. But this is not *266 a situation where there are no laws governing sports gambling in New Jersey. Absent the 2014 Law, New Jersey’s myriad laws prohibiting sports gambling would apply to the casinos and racetracks. Thus, the 2014 Law provides the authorization for conduct that is otherwise clearly and completely legally prohibited.
Second, the 2014 Law authorizes sports gambling by selectively dictating where sports gambling may occur, who may place bets in such gambling, and which athletic contests are permissible subjects for such gambling. Under the 2014 Law, New Jersey’s sports gambling prohibitions are specifically removed from casinos, gambling houses, and horse racetracks as long as the bettors are people age 21 or over, and as long as there are no bets on either New Jersey college teams or collegiate competitions occurring in New Jersey. The word “authorize” means, inter alia, “[t]o empower; to give a right or authority to act,” or “[t]o permit a’thing to be done in the future.” Black’s Law Dictionary 133 (6th ed.1990).[6] The 2014 Law allows casinos and racetracks and their patrons to engage, under enumerated circumstances, in conduct that other businesses and their patrons cannot do. That selectiveness constitutes specific permission and empowerment.
Appellants place much. stock in our statement in Christie I that their argument there rested on a “false equivalence between repeal and authorization.” 730 F.3d at 233. They claim that the 2014 Law does not authorize sports gambling because it is only a “repeal” and, in Christie I, we stated that “the lack of an affirmative prohibition of an activity does not mean it is affirmatively authorized by law.” Id. at 232. In other words, they argue that, because the 2014 Law is only a repeal removing' prohibitions against sports gambling, it is not an “affirmative authorization” under Christie I. We agree that, had the 2014 Law repealed all prohibitions on sports gambling, we would be hard-pressed, given Christie /, to find an “authorizing by law” in violation of PAS-PA. But that is not what occurred here. The presence of the word “repeal” does not prevent us from examining what the provision actually does, and the Legislature’s use of the term does not change the fact that the 2014 Law selectively grants permission to certain entities to engage in sports gambling. New Jersey’s sports gambling prohibitions remain and no one may engage in such conduct save those listed by the 2014 Law. While artfully couched in terms of a repealer, the 2014 Law essentially provides that, notwithstanding any other prohibition by law, casinos and racetracks shall hereafter be permitted to have sports gambling. This is not a repeal; it is an authorization.
Third, the exception in PASPA for New Jersey, which New Jersey did not take advantage of before the one-year time limit expired, is remarkably similar to the 2014 Law. The exception states that PAS-PA does not apply to “a betting, gambling, or wagering scheme ... conducted exclusively in casinos ..., but only to the extent that ... any commercial casino gaming scheme was in operation ... throughout the 10-year period” before PASPA was enacted. 28 U.S.C. § 3704(a)(3)(B). The exception would have permitted sports gambling at New Jersey’s casinos, which is just what the 2014 Law does. We can easily infer that, by explicitly excepting a scheme of sports gambling in New Jersey’s casinos from PASPA’s prohibitions, *267 Congress intended that such a scheme would violate PASPA. If Congress had not perceived that sports gambling in New Jersey’s casinos would violate PASPA, then it would not have needed to insert the New Jersey exception. In other words, if sports gambling in New Jersey’s casinos does not violate PASPA, then PASPA’s one-year exception for New Jersey would have been superfluous. We will not read statutory provisions to be surplusage. See Marx v. Gen. Revenue Corp., — U.S. -, 138 S.Ct. 1166, 1178, 185 L.Ed.2d 242 (2013) (“[T]he canon against surplusage is strongest when an interpretation would render superfluous another part of the same statutory scheme.”). In order to avoid rendering the New Jersey exception surplusage, we must read the 2014 Law as authorizing a scheme that clearly violates PASPA.[7]
As support for their argument that the 2014 Law does not violate PASPA, Appellants cite the 2014 Law’s construction provision, which provides that “[t]he provisions of this act ... are not intended and shall not be construed as causing the State to sponsor, operate, advertise, promote, license, or authorize by law or compact” sports wagering. N.J. Stat. Ann. § 5:12A-8. This conveniently mirrors PASPA’s language providing that states may not “sponsor, operate, advertise, promote, license, or authorize by law or compact” sports wagering. 28 U.S.C. § 3702(1).
The construction provision does not save the 2014 Law. States may not use clever drafting or mandatory construction provisions to escape the supremacy of federal law. Cf. Haywood v. Drown, 556 U.S. 729, 742, 129 S.Ct. 2108, 173 L.Ed.2d 920 (2009) (“[T]he Supremacy Clause cannot be evaded by formalism.”); Howlett ex rel. Howlett v. Rose, 496 U.S. 356, 382-83, 110 S.Ct. 2430, 110 L.Ed.2d 332 (1990) (“[t]he force of the Supremacy Clause is not so weak that it can be evaded by mere mention of’ a particular word). In the same vein, the New Jersey Legislature cannot use a targeted construction provision to limit the reach of PASPA or to dictate to a court a construction that would limit that reach. The 2014 Law violates PASPA, and the construction provision cannot alter that fact.
Appellants also draw a comparison between the 2014 Law and the 2012 Law, which involved a broad regulatory scheme, as evidence that the 2014 Law does not violate PASPA. It is true that the 2014 Law does not set forth a comprehensive scheme or provide for a state regulatory role, as the 2012 Law did. However, PAS-PA does not limit its reach to active state involvement or regulation of sports gambling. It prohibits a range of state activity, the least intrusive of which is “authorization” by law of sports gambling.
We conclude that the 2014 Law violates PASPA because it authorizes by law sports gambling.[8]
*268 B. Injunctive Relief
The NJTHA argues that the injunction should apply only to the parties who brought this suit and that gambling on the athletic contests of other entities, who are not parties to this suit, should be permitted. But PASPA does not limit its prohibition to sports gambling involving only entities who actually bring suit. PASPA provides that “[a] civil action to enjoin a violation of section 3702 ... may be commenced ... by a professional sports organization or amateur sports organization whose competitive game is alleged to be the basis of such violation.” 28 U.S.C. § 3703. The NJTHA conflates the Leagues’ right to bring suit with the remedy they may obtain. PASPA provides that the Leagues may “enjoin a violation of section 3702,” without any limiting language. The 2014 Law violates PASPA in all contexts, not simply as applied to the Leagues, and, therefore, the District Court properly enjoined its application in full.
Finally, we need not dwell on the NJTHA’s argument that the Leagues should not be entitled to equitable relief because they have unclean hands. The NJTHA contends that the Leagues are essentially hypocrites because they encourage and profit from sports betting, noting that the NFL has been scheduling games in London where sports gambling is legal, that the NCAA holds events in Las Vegas where sports gambling is legal, and that the Leagues sanction and encourage fantasy sports betting. These allegations fail to rise to the level required for application of the unclean hands doctrine. “The equitable doctrine of unclean hands applies when a party seeking relief has committed an unconscionable act immediately related to the equity the party seeks in respect to the litigation.” Highmark, Inc. v. UPMC Health Plan, Inc., 276 F.3d 160, 174 (3d Cir.2001). It is not “unconscionable” for the Leagues to support fantasy sports and hold events in Las Vegas or London, nor is doing so “immediately related” to the 2014 Law. We cannot conclude that the Leagues acted unconscionably, i.e., amorally, abusively, or with extreme unfairness, in relation to the 2014 Law.
IV. Conclusion
The 2014 Law violates PASPA because it authorizes by law sports gambling. We will affirm.

. The sports leagues were the National Collegiate Athletic Association ("NCAA”), National Football League ("NFL”), National Basketball Association, National Hockey League, and the Office of the Commissioner of Baseball, doing business as Major League Baseball (collectively, the "Leagues”).

. The Leagues named as defendants Christopher J. Christie, the Governor of the State of New Jersey; David L. Rebuck, the Director of the New Jersey Division of Gaming Enforcement ("DGE”) and Assistant Attorney General of the State of New Jersey; and Frank Zanzuccki, Executive Director of the New Jersey Racing Commission ("NJRC”). The New Jersey Thoroughbred Horsemen's Association, Inc. (“NJTHA”) intervened as a defendant, as did Stephen M. Sweeney, President of the New Jersey Senate, and Sheila Y. Oliver, Speaker of the New Jersey General Assembly ("State Legislators”). We collectively refer to these parties as the “New Jersey Parties.” In the present case, the New Jersey Parties are the same, with some exceptions. NJTHA was named as a defendant (i.e., it did not intervene), as was the New Jersey Sports and Exposition Authority; the latter is not participating in this appeal. Additionally, Vincent Prieto, not Sheila Y. Oliver, is now the Speaker of the General Assembly.

. In the District Court, the New Jersey Enjoined Parties urged that the Eleventh Amendment gave them immunity such that they could not be sued in an action challenging the *264 2014 Law. The District Court rejected this argument, as do we, and we note that, while the issue was briefed, the New Jersey Enjoined Parties did not press — or even mention — this issue at oral argument. They contend that, because the 2014 Law is a self-executing repeal that requires no action from them or any other state official, they are immune from suit. This argument fails. The New Jersey Enjoined Parties are subject to suit under the Ex parte Young exception to Eleventh Amendment immunity, which "permitís] the federal courts to vindicate federal rights and hold state officials responsible to 'the supreme authority of the United States.' ” Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 105, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) (quoting Ex parte Young, 209 U.S. 123, 160, 28 S.Ct. 441, 52 L.Ed. 714 (1908)). The New Jersey Enjoined Parties are not arguing that other state officials should have been named instead of them; they are arguing that no state official can be sued regarding the 2014 Law. We disagree. The Leagues named the state officials who are most closely connected to the 2014 Law, i.e., the Governor, the Director of the DGE, and the Executive Director of the NJRC. The Leagues did not name officials who bear no connection whatsoever to the 2014 Law. See Young, 209 U.S. at 156, 28 S.Ct. 441 (explaining that plaintiffs cannot name just any state official, such as a "state superintendent of schools” simply "to test the constitutionality” of a law). See also Rode v. Dellarciprete, 845 F.2d 1195, 1208 (3d Cir.1988) (noting that a suit against the governor would be appropriate when challenging a "self-enforcing statute” because "[t]he plaintiff would have been barred from challenging the statute by the eleventh amendment unless it could name the Governor as a defendant”).

. "We review a district court’s grant of summary judgment de novo____” Viera v. Life Ins. Co. of N. Am., 642 F.3d 407, 413 (3d Cir.2011). "We review a district court’s grant of a permanent injunction for abuse of discretion.” Meyer v. CUNA Mut. Ins. Soc’y, 648 F.3d 154, 162 (3d Cir.2011).

. It has also been criticized as unconstitutional, but we held otherwise in Christie I and we cannot and will not revisit that determination here. See Christie I, 730 F.3d at 240 ("[Njothing in PASPA violates the U.S. Constitution. The law neither exceeds Congress’ enumerated powers nor violates any principle of federalism implicit in the Tenth Amendment or anywhere else in our Constitutional structure.”).

. We cite the version of Black’s Law Dictionary that was in effect in 1992, the year PASPA was passed.

. Granted, the 2014 Law applies to horse racetracks as well as casinos, while the PAS-PA exception for New Jersey refers only to casinos, but that does not change the significance of the New Jersey exception because it refers to gambling in places that already allow gambling, and the racetracks fall within that rubric.

. Because we conclude that the 2014 Law authorizes by law sports gambling, we need not address the argument made by Appellees and Amicus that the 2014 Law also licenses sports gambling by permitting only those entities that already have gambling licenses or recently had such licenses to conduct sports gambling operations. We also do not address the argument of the State Legislators and the NJTHA that, to the extent that any aspect of the 2014 Law violates PASPA, we should apply the 2014 Law’s severability clause. The State Legislators and the NJTHA offer no proposals regarding what provisions should *268 be severed from the 2014 Law, and we do not see how we could sever it.